# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued March 12, 2024          Decided May 14, 2024

No. 23-5074

MOHAMMED JIBRIL, INDIVIDUALLY, AND ON BEHALF OF THEIR
MINOR CHILDREN Y.J., AND O.J., ET AL.,
APPELLANTS

v.

ALEJANDRO N. MAYORKAS, IN HIS OFFICIAL CAPACITY
AS SECRETARY OF THE DEPARTMENT OF HOMELAND
SECURITY, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:19-cv-02457)

———

*Christina A. Jump* argued the cause for appellants. With
her on the briefs were *Chelsea G. Glover* and *Samira S.
Elhosary*.

*Joshua Waldman*, Attorney, U.S. Department of Justice,
argued the cause for appellees. With him on the briefs were
*Brian M. Boynton*, Principal Deputy Assistant Attorney
General, and *Sharon Swingle*, Attorney.

Before: HENDERSON, *Circuit Judge*, and EDWARDS and GINSBURG, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: In 2018, seven members of the Jibril family ("the Jibrils" or "Appellants") suffered extensive and intrusive security screenings and were forced to endure significant delays during their domestic and international airline travels. The Jibrils surmised that they had suffered these personal indignities and related disruptions in their travel because they had been wrongfully placed on the so-called "Selectee List," one of the U.S. Government's terrorist watchlists. Because they were concerned about their welfare during future trips that they planned to take, the Jibrils invoked a Department of Homeland Security ("DHS") administrative redress process to challenge their alleged inclusion on the Selectee List. When federal officials refused to share information on their watchlist status, the Jibrils filed suit in the District Court alleging violations of the Fourth and Fifth Amendments and the Administrative Procedure Act ("APA"). The Jibrils named the Secretary of the DHS and various other federal officials in their official capacities as defendants (collectively, "Government"), and sought declaratory and injunctive relief for their injuries.

In the first iteration of this case, the Government neither confirmed nor denied the Jibrils' Selectee List status, and the District Court dismissed the Jibrils' complaint for lack of standing. *Jibril v. Wolf* ("*Jibril I*"), 2020 WL 2331870, at *2-3 (D.D.C. May 9, 2020). This court reversed in part and remanded, holding that the Jibrils plausibly alleged that they were on a terrorist watchlist and faced imminent risk of undue Government actions sufficient to support most of their claims

for prospective relief. *Jibril v. Mayorkas* ("*Jibril II*"), 20 F.4th 804, 812-13 (D.C. Cir. 2021). On remand, the Government filed a renewed motion to dismiss, this time submitting an *ex parte* declaration to the District Court for *in camera* review. *See* Robinson Declaration ("Decl."), *reprinted in* Joint Appendix ("J.A.") 50-64 (redacted version). Based on this *ex parte* submission, the District Court held that the Jibrils lacked standing to pursue their complaint for prospective relief. *Jibril v. Mayorkas* ("*Jibril III*"), 2023 WL 2240271, *5 (D.D.C. Feb. 27, 2023). The District Court reasoned, without explicitly confirming or denying the contents of the *ex parte* submission, that "[i]f the government provided evidence that satisfied this Court that no member of the family is now on the Selectee List, nor is there any reason they should be added to that list absent some future development," then "the Jibrils could not adequately allege an imminent threat of future injury for those claims challenging the Government's policies and the alleged lack of adequate redress process." *Id.* at *8 (quotation omitted). Appellants once again appealed the District Court's dismissal of their case.

In this second appeal, Appellants argue that the District Court's resolution of the case based on the Government's *ex parte* submission was inappropriate, because the court should have treated the complaint's factual allegations as true at the motion to dismiss stage, and because the court's reliance on *ex parte* information deprived Appellants of a chance to respond. Appellants also argue that they have standing regardless of the contents of the *ex parte* submission, because they need not be on a government watchlist to establish imminent risk of future harm and to bring a facial challenge to the Government's policies. In the alternative, Appellants argue that the District Court erred in denying their motion for leave to amend their complaint.

A week after this court heard oral argument, the Supreme Court decided *FBI v. Fikre*, 144 S. Ct. 771 (2024). In that case, the Court held that the plaintiff's claims challenging his inclusion on a "No Fly List" were not moot simply because the Government removed him from the No Fly List *after* he filed suit and promised not to relist him based on currently available information. *Id.* at 778. Following the Supreme Court's decision in *Fikre,* this court directed the parties here to provide supplemental briefing addressing the applicability, if any, of *Fikre* to the issues in this case.

Upon consideration of the original and supplemental briefs, including the Government's *ex parte* submission, we agree with the District Court that Appellants lack standing to seek forward-looking relief. In short, if, hypothetically, the Government's *ex parte* declaration revealed that Appellants were not on the Selectee List when they filed suit, they would have standing to seek prospective relief only if they could show a "sufficiently imminent and substantial" likelihood of being added in the future. *Jibril III*, 2023 WL 2240271, at \*7 (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 435 (2021)). Appellants have not met this burden. We therefore affirm the District Court's dismissal of Appellants' claims for want of standing. We also hold that the District Court did not abuse its discretion in relying on the Government's *ex parte* submission to address matters implicating national security concerns. Finally, we find no error in the District Court's denial of Appellants' motion for leave to amend their complaint.

## I.  BACKGROUND

The factual and procedural background of this case has been extensively covered by this court and the District Court in prior opinions. *See Jibril I*, 2020 WL 2331870, at \*3 (dismissing for lack of standing); *Jibril II*, 20 F.4th at 812-13

(finding standing for most claims and reversing); *Jibril III*, 2023 WL 2240271, at \*5 (dismissing again on remand for lack of standing). Therefore, we assume familiarity with the prior opinions and limit our recitation of the facts and procedural history to the matters most relevant to this appeal.

### A. Factual History

The Federal Bureau of Investigation ("FBI") administers the multi-agency Terrorist Screening Center, which maintains the Terrorist Screening Dataset (formerly known as the Terrorist Screening Database, and commonly referred to as the terrorist watchlist). *See Jibril II*, 20 F.4th at 808; *see also* J.A. 40. The terrorist watchlist contains at least two subset categories intended to identify known or suspected terrorists: the "No Fly List" and the "Selectee List." *See Jibril II*, 20 F.4th at 808. The Transportation Security Administration ("TSA") prohibits individuals on the No Fly List from boarding a U.S. commercial aircraft or flying within the United States. Robinson Decl. ¶ 11. In contrast, individuals on the Selectee List may board a commercial aircraft but are subject to enhanced screening. *Id.* ¶ 12. The exact criteria for inclusion on the Selectee List are not public. *Id.* The Government has represented that it places individuals on the Selectee List who "meet the reasonable suspicion standard applicable to known or suspected terrorists and also satisfy additional specific criteria, but do not meet the criteria required for inclusion on the No Fly list." *Id.*

"If an individual believes he or she has been improperly or unfairly delayed or prohibited from boarding an aircraft" because of placement on a watchlist, the individual may seek redress through the DHS Traveler Redress Inquiry Program ("TRIP"). 49 C.F.R. § 1560.205(a), (b). The TSA then

coordinates with the Terrorist Screening Center and other federal agencies as necessary to "review all the documentation and information requested from the individual, correct any erroneous information, and provide the individual with a timely written response." *Id.* § 1560.205(d). However, for security reasons, the Government generally neither confirms nor denies an individual's status on the Selectee List, though it sometimes informs individuals of their placement on the No Fly List. *See* J.A. 47.

The facts, as the Jibrils allege them, are as follows. *See Casey v. McDonald's Corp.*, 880 F.3d 564, 567 (D.C. Cir. 2018) ("On a motion to dismiss, we must assume that the allegations of the complaint are true."). The Jibrils are a family of U.S. citizens of Jordanian origin, comprising two parents, three of their adult children, and two of their minor children. The Jibrils have routinely traveled to Jordan at least every two to three years; the father, Mr. Mohammed Jibril, has visited relatives in Jordan between 12 to 15 times over the past 25 years. Additionally, the Jibrils are Muslims with sincerely held religious beliefs that require traveling to Saudi Arabia to complete Hajj and pilgrimage obligations.

In 2018, the Jibrils traveled to the Middle East to visit family in Jordan. However, during their airline trips, the Jibrils were subjected to extensive and intrusive security screenings at airports within the United States and abroad. After waiting an hour at the Los Angeles airport for their departing flight, the Jibrils all received boarding passes with "SSSS" printed on them. The Jibrils, including their minor children, were then searched for about two hours, causing them to almost miss their flight. Once the Jibrils landed in Jordan, they were interrogated for another two hours. Similarly, on their trip home after their two-month stay in Jordan, the Jibrils again received boarding passes with "SSSS" stamped on them. During their layover in

the United Arab Emirates, Abu Dhabi officials interrogated the family for roughly 45 minutes. U.S. Customs and Border Protection agents in Abu Dhabi then detained the Jibrils and interrogated them separately for at least another four hours. Because of their prolonged detention, the Jibrils missed their flight and stayed in Abu Dhabi overnight. When they returned the next day, their electronic devices were searched again for at least an hour.

All seven family members submitted complaints to DHS TRIP based on these experiences. Five received identical responses that DHS TRIP could "neither confirm nor deny any information about [them] which may be within federal watchlists." *Jibril II*, 20 F.4th at 810-11 (quotation omitted). The Jibrils believe this is the standard response sent to people who are not on the No Fly List, but who could be on the Selectee List. O.J., a minor, received a different response that his experience was most likely caused by misidentification or random selection. And one family member never received a response.

## B. Procedural History (Including the Findings of the District Court)

On August 13, 2019, the Jibrils filed suit in the District Court. The complaint alleged violations of the Fourth Amendment right against unreasonable searches and seizures; violations of the Fifth Amendment right to due process because of their apparent placement on the Selectee List and the allegedly inadequate DHS TRIP redress procedures; and violations of the APA due to the detention conditions and the inadequacy of the DHS TRIP process. Complaint ¶¶ 146-200, J.A. 25-31.

On May 9, 2020, the District Court dismissed the case for lack of standing. *Jibril I*, 2020 WL 2331870, at *3. On appeal, this court reversed in part and remanded, holding that the Jibrils had standing to pursue most of their claims for prospective relief. *See Jibril II*, 20 F.4th at 813 (holding that the Jibrils only lacked standing to challenge the Government's allegedly unlawful pat-down searches of minors and the separation of minors from their families). This court reasoned that the Jibrils alleged facts plausibly indicating that they were all on the Selectee List in 2018, remained on the watchlist, and would soon travel again. *Id.* at 814-15. The court explained that it "infer[red] from the Jibrils' factual allegations that the family members remain on the watchlist," "[b]ecause the Government ha[d] provided no information to the contrary." *Id.* at 816. Accordingly, "[o]n the record before [it]," this court concluded that the Jibrils adequately alleged an imminent risk of future injury from the challenged Government actions. *Id.* at 817.

On remand, the Government filed a renewed motion to dismiss for want of standing, this time supporting its motion with an *ex parte* declaration from FBI Special Agent and Associate Deputy Director of the Terrorist Screening Center, Samuel P. Robinson. *Jibril III*, 2023 WL 2240271, at *3. The Jibrils protested that the *ex parte* submission was inappropriate. *Id.* at *5. However, the District Court maintained that *ex parte*, *in camera* review was "permissible in certain extraordinary circumstances implicating national security concerns," such as in this case. *Id.* (citing *Jifry v. FAA*, 370 F.3d 1174, 1181-82 (D.C. Cir. 2004)).

Based on the Government's *ex parte* submission, the District Court dismissed the case again for lack of standing. *Id.* In doing so, the court expressed reluctance "to indulge what almost seems to be a sick sense of delight the government has taken in withholding from the Jibrils information that is key to

the resolution of a jurisdictional question in their case." *Id.* Nonetheless, the District Court avoided explicitly disclosing information about any individual's status on the Selectee List, instead explaining its reasons for dismissing the case as follows:

> If, hypothetically, Mohammed Jibril were placed on the Selectee List but his family members were not, the other Jibrils would lack standing to seek prospective relief on any of their claims for that reason alone, unless they could adequately allege concrete future plans to travel with him in particular. It is conceivable given the Circuit's reasoning in *Jibril II* that the other Jibrils could make that showing. However, that would not be enough to survive a motion to dismiss for lack of subject-matter jurisdiction if their intended travel partner were no longer on the Selectee List himself.

> If, hypothetically, Mohammed Jibril were placed on the Selectee List prior to the family's 2018 trip to Jordan and subsequently removed from that list after initiating his DHS TRIP inquiry but prior to the filing of the complaint, the Jibrils would lack standing to seek prospective relief because they could not demonstrate a substantial risk of future injury. In that case, standing, not mootness, would be the proper framework for evaluating the problem with subject-matter jurisdiction, because standing is judged at the filing of the complaint and mootness is judged during the pendency of the action. And if the government satisfied the Court with an affidavit given under penalty of perjury that it would not add Mohammed Jibril back to the Selectee List unless new information provided a reason for doing so, any apprehension that the Jibrils might be subjected to similar enhanced

screening measures on a future trip (Counts I, II, and IV), or have any reason to make further attempts to contest their potential watchlist status (Counts III and V), would depend on the hypothetical possibility that the government might receive new information in the future convincing it that Mohammed Jibril once again met the criteria for inclusion on the Selectee List. Without a way of demonstrating that a threatened inquiry was certainly impending or there was a substantial risk that the harm will occur, the Jibrils would be unable to meet their burden of establishing standing.

*Id.* at *6 (alterations, citation, and quotations omitted).

The District Court further rejected the Jibrils' argument that they would have standing to bring a facial challenge to the DHS TRIP process itself under the Due Process Clause and the APA, even if they were not on the Selectee List when they filed suit:

The Jibrils' due process and APA challenges to the DHS TRIP program do not allege that it is that program that deprives them of a protected liberty or property interest without due process. Rather, those challenges allege that the DHS TRIP program is a constitutionally inadequate process for a deprivation effected by their alleged placement on the Selectee List. The Jibrils allege that the government has deprived them, and continues to deprive them, of a protected liberty interest within the meaning of the due process clause by "chilling" their exercise of their right to travel and to freely practice their religion. . . . They also argue that the government has deprived them, and continues to deprive them, of a protected

reputational interest by disseminating their alleged placement on the Selectee List to government officials and potentially private institutions, and by making that alleged placement apparent to fellow travelers at airports who may witness the enhanced screening measures in application—a so-called "stigma-plus" claim.

Even if the interests cited by the Jibrils amount to constitutionally protected liberty interests, the alleged injuries to those interests would be ongoing only if the Jibrils were in fact currently on the Selectee List. And if the Jibrils were not on the Selectee List, they would have standing to seek prospective relief only if they could demonstrate a "sufficiently imminent and substantial" risk of being added to it in the future. *TransUnion*, 141 S. Ct. at 2210. Put more concretely, the Jibrils would not be subjected to enhanced screening, listed as suspected terrorists, or pulled out of line in front of other travelers because of the Selectee List if none of them were on the Selectee List. And if the challenged policy did not continue to injure the Jibrils, nor could they demonstrate a substantial likelihood that it would injure them again in the future, they would not have standing to challenge that policy.

*Jibril III*, 2023 WL 2240271, at *7 (footnote and citations omitted).

Finally, the District Court denied the Jibrils' motion for leave to amend their complaint to seek nominal damages. The District Court noted that "the Jibrils might theoretically have standing to pursue retrospective, monetary relief to redress the alleged injuries they suffered during their 2018 trip to Jordan."

*Id.* at *8. However, the District Court held that the proposed amendment would be futile, because the Jibrils sued federal officers in their official capacity and they had not identified a waiver of sovereign immunity to support a claim for monetary relief. *Id.* at *8 & n.3. The District Court thus denied the Jibrils' motion to amend their complaint and dismissed the case. The present appeal followed.

This court heard oral argument on March 12, 2024. A week later, the Supreme Court held in *FBI v. Fikre* that the Government could not moot a case simply by removing the plaintiff from the No Fly List after he filed suit and promising the plaintiff that he "w[ould] not be placed on the No Fly List in the future based on the currently available information." *Fikre*, 144 S. Ct. at 778 (quotation omitted). We then directed the parties in this case to submit supplemental briefing "addressing the applicability, if any, of the Supreme Court's recent decision in [*Fikre*] on the issues in this case." Order, *Jibril v. Mayorkas*, No. 23-5074 (D.C. Cir. Mar. 21, 2024).

## II. ANALYSIS

### A. Standard of Review

We review a district court's dismissal for lack of subject matter jurisdiction *de novo*. *Saline Parents v. Garland*, 88 F.4th 298, 303 (D.C. Cir. 2023). We review "[t]he fact-finding of the court to support or deny standing . . . under the clearly erroneous standard." *Haase v. Sessions*, 835 F.2d 902, 907 (D.C. Cir. 1987). And we review for abuse of discretion a district court's decision to review evidence *ex parte*, *Labow v. DOJ*, 831 F.3d 523, 533 (D.C. Cir. 2016), and to deny a motion for leave to amend a complaint, *Williams v. Lew*, 819 F.3d 466, 471 (D.C. Cir. 2016).

### B. *The District Court's* Ex Parte, In Camera *Review*

Appellants contend that the District Court's reliance on *ex parte* evidence was improper because it should have treated the complaint's factual allegations as true at the motion to dismiss stage. Appellants also argue that *ex parte*, *in camera* review wrongfully deprived them of their right to challenge the facts upon which the Government moved for dismissal. We find no merit in these claims.

"It is well-settled that [a court] may consider materials outside the pleadings to determine [its] jurisdiction." *Kareem v. Haspel*, 986 F.3d 859, 866 n.7 (D.C. Cir. 2021). In assessing whether a plaintiff has standing, a court can "test the asserted theory of injury, causation, and redressability at the factual, evidentiary level." *Haase*, 835 F.2d at 907. "[T]he court can initiate this factual inquiry at the motion to dismiss stage" and "base its standing decision on its assessment of the facts." *Id.* (citing *Duke Power Co. v. Carolina Env't Study Grp., Inc.*, 438 U.S. 59, 67-68 (1978)). Here, the District Court recognized that it had "an 'independent obligation' to assure itself that it ha[d] subject-matter jurisdiction." *Jibril III*, 2023 WL 2240271, at *6 (quoting *Hertz Corp. v. Friend*, 559 U.S. 77, 94 (2010)). The District Court therefore reviewed the Government's *ex parte* submission, and then concluded that it "s[aw] no conceivable way" for the Jibrils to challenge the Government's position "even with a full opportunity for adversarial testing." *Jibril III*, 2023 WL 2240271, at *6.

The District Court's decision to accept and credit the Government's *ex parte* declaration was not improper. An authorized Government official signed the contested declaration under penalty of perjury. In these circumstances, we afford a presumption of regularity to the official acts of public officers in the absence of clear evidence to the contrary.

*See Latif v. Obama*, 666 F.3d 746, 748-49 (D.C. Cir. 2011) (holding that intelligence reports produced by government official and contested by Guantanamo detainee were entitled to a presumption of regularity).

Furthermore, the District Court did not abuse its discretion in reviewing the Government's declaration *ex parte* and *in camera*, without giving Appellants an opportunity to challenge its contents. *Ex parte* submissions "generally are disfavored because they conflict with a fundamental precept of our system of justice: a fair hearing requires a reasonable opportunity to know the claims of the opposing party and to meet them." *U.S. v. Microsoft Corp.*, 56 F.3d 1448, 1464 (D.C. Cir. 1995) (quotations omitted). However, "in cases in which sensitive materials may be in issue, . . . 'the court has inherent authority to review [such] material *ex parte*, *in camera* as part of its judicial review function.'" *Olivares v. TSA*, 819 F.3d 454, 462 (D.C. Cir. 2016) (quoting *Jifry*, 370 F.3d at 1181-82).

As relevant here, there are legal and policy constraints cabining the disclosure of an individual's status on the Selectee List. Under 49 C.F.R. § 1520.5(b)(9)(ii), "[a]n individual's placement on the . . . Selectee list, as well as any explanation for the placement, is 'Sensitive Security Information' that is restricted from public access." *Matar v. TSA*, 910 F.3d 538, 540 (D.C. Cir. 2018); *see also Jibril II*, 20 F.4th at 817 (noting that "Selectee List status constitutes Sensitive Security Information") (citing 49 U.S.C. § 114(r); 49 C.F.R. § 1520.5(a)). In addition, courts generally "do not second-guess expert agency judgments on potential risks to national security." *Olivares*, 819 F.3d at 462. "Rather, we defer to the informed judgment of agency officials whose obligation it is to assess risks to national security." *Id.* In this case, the Government's declaration reasonably explained the national security concerns motivating the *ex parte* filing. For instance,

the Government maintained that disclosure of an individual's watchlist status "would arm terrorists with the knowledge of who would be required to undergo additional screening and who would not," which could facilitate terrorists in evading enhanced security screening. Robinson Decl. ¶ 29. Disclosure could also compromise ongoing counterterrorism investigations by "giving members of terrorist groups the opportunity to gauge whether a particular individual is the subject of counterterrorism, intelligence, or investigative interest, causing the person to alter his or her behavior, destroy evidence, take new precautions against surveillance, or change the level of any terrorism-related activity in which he or she is engaged." *Id.* ¶ 26. Therefore, given the legitimate security concerns at issue, the District Court did not err in conducting an *ex parte*, *in camera* review of the Government's declaration.

### C. Standing

The Government contends that the Jibrils lack standing to pursue prospective relief because they have not plausibly alleged an imminent risk of future injury. In the Jibrils' first appeal, "the Government neither confirmed nor denied the Jibrils' Selectee List status." *Jibril II*, 20 F.4th at 812. Consequently, we reasoned that Appellants had standing to pursue most of their prospective-relief claims because their factual allegations led this court to the reasonable inference that the family members were on the Selectee List during their 2018 travels and remained on the list when we first heard this case. *Id.* at 816. We noted that we would "presume that the family members' watchlist status 'remains the same' '[u]nless the [G]overnment provides documentation' to the contrary." *Id.* (alterations in original) (quoting *Shearson v. Holder*, 725 F.3d 588, 593 (6th Cir. 2013)). On remand, the Government then submitted an *ex parte* declaration for *in camera* review, and again moved to dismiss for lack of standing. Upon review of

this new information, the District Court once again dismissed the case. Based on this court's assessment of the Government's *ex parte* submission, we agree that the Jibrils lack standing to pursue their claims for prospective relief.

"The Constitution grants federal courts jurisdiction to decide 'Cases' or 'Controversies.'" *Fikre*, 144 S. Ct. at 777 (quoting Art. III, §§ 1, 2). To satisfy the case-or-controversy requirement under Article III, a "plaintiff must have a personal stake in the case—in other words, standing." *TransUnion*, 594 U.S. at 423 (quotations omitted). A plaintiff establishes standing by showing "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *Id.* As relevant here, an alleged future injury may suffice to meet the injury-in-fact element of standing if the threatened injury is "certainly impending" or there is a "substantial risk" it will occur. *Hemp Indus. Ass'n v. Drug Enf't Admin.*, 36 F.4th 278, 290 (D.C. Cir. 2022) (citing *Attias v. Carefirst, Inc.*, 865 F.3d 620, 627 (D.C. Cir. 2017)).

We understand that, in addressing matters presented to the court, federal judges generally "are not free to take up hypothetical questions that pique a party's curiosity or their own." *Fikre*, 144 S. Ct. at 777. However, given the unusual constraints of this case – which include national security concerns, *in camera* review, and critical evidence supported by an *ex parte* submission – the District Court usefully employed hypotheticals to impartially assess the matters in dispute while avoiding explicitly disclosing the contents of the Government's *ex parte* submission. The Government has not contested the District Court's "hypothetical" characterizations, nor has it objected to any of the District Court's findings. The District Court wisely understood that hypotheticals would be a

thoughtful way to meaningfully respond to Appellants' quest for redress in a case in which important information is beyond their reach due to national security concerns. Appellants are not left with "no response" as they were in the first round of this case. Appellants may not be satisfied with the judgment in this case, but they will likely have a better understanding of their situation. What follows are critical findings that defeat Appellants' claims.

The District Court first held that Appellants have not sufficiently alleged a "certainly impending" or "substantial risk" of injury in their future travels. *See Jibril III*, 2023 WL 2240271, at *6. As the District Court reasoned, any member of the Jibril family who has never been on the Selectee List would lack standing to seek prospective relief, unless they could show concrete plans to travel again with a family member on the Selectee List.

> If, hypothetically, Mohammed Jibril were placed on the Selectee List but his family members were not, the other Jibrils would lack standing to seek prospective relief on any of their claims for that reason alone, unless they could adequately allege concrete future plans to travel with him in particular. . . . However, [even] that would not be enough to survive a motion to dismiss for lack of subject-matter jurisdiction if their intended travel partner were no longer on the Selectee List himself.

*Id.*

The District Court then concluded that if *no* member of the Jibril family was on the Selectee List when the Jibrils filed suit – either because they were never on the list to begin with or because they were removed from the list before they filed suit

– then none of the Jibrils would be able to show an "imminent and substantial" risk of future harm sufficient to support a claim for prospective relief. *Id.* at *7 (quoting *TransUnion*, 594 U.S. at 435).

> If, hypothetically, Mohammed Jibril were placed on the Selectee List prior to the family's 2018 trip to Jordan and subsequently removed from that list after initiating his DHS TRIP inquiry but prior to the filing of the complaint, the Jibrils would lack standing to seek prospective relief because they could not demonstrate a substantial risk of future injury. . . . [I]f the government satisfied the Court with an affidavit given under penalty of perjury that it would not add Mohammed Jibril back to the Selectee List unless new information provided a reason for doing so, any apprehension that the Jibrils might be subjected to similar enhanced screening measures on a future trip (Counts I, II, and IV), or have any reason to make further attempts to contest their potential watchlist status (Counts III and V), would depend on the hypothetical possibility that the government might receive new information in the future convincing it that Mohammed Jibril once again met the criteria for inclusion on the Selectee List. Without a way of demonstrating that a threatened inquiry was certainly impending or there was a substantial risk that the harm will occur, the Jibrils would be unable to meet their burden of establishing standing.

*Id.* at *6 (alterations and quotations omitted).

The District Court additionally rejected Appellants' contention that removal from the Selectee List would not affect their standing to bring a facial challenge to the DHS TRIP

process itself on due process and APA grounds. The District Court explained that if, hypothetically, none of the Jibrils were on the Selectee List when the suit was filed, then they would not face a substantial risk of harm from the allegedly inadequate DHS TRIP process sufficient to establish standing for their facial challenge.

> The Jibrils' due process and APA challenges to the DHS TRIP program do not allege that it is that program that deprives them of a protected liberty or property interest without due process. Rather, those challenges allege that the DHS TRIP program is a constitutionally inadequate process for a deprivation effected by their alleged placement on the Selectee List. . . .

> [However,] the Jibrils would not be subjected to enhanced screening, listed as suspected terrorists, or pulled out of line in front of other travelers because of the Selectee List if none of them were on the Selectee List. And if the challenged policy did not continue to injure the Jibrils, nor could they demonstrate a substantial likelihood that it would injure them again in the future, they would not have standing to challenge that policy.

*Id.* at \*7 (footnote omitted).

We agree with the District Court's reasoning and adopt its analysis. In addition, we amplify two points. First, importantly, Appellants' complaint does not raise any claims for retrospective relief. In the hearings before both courts, the Government did not doubt the possibility of Appellants seeking retrospective relief; rather, the Government contended, and we have found, that Appellants' submissions in this case do not

support a claim for retrospective relief. In consequence, we do not opine on whether a claim for retrospective relief would be viable if properly raised. For instance, the District Court posed a hypothetical regarding individuals subjected to multiple intrusive and extensive screenings, despite not being on the Selectee List. We leave for another day the question of whether plaintiffs could successfully seek damages in such situations.

Second, the Supreme Court's decision in *Fikre* does not affect the outcome of this case. *Fikre* concerned the Government's ability to show that plaintiff's claims were moot. The plaintiff in *Fikre* was on the No Fly List when he sued the Government to challenge his placement, and he was removed from the watchlist during the pendency of the litigation. *See Fikre*, 144 S. Ct. at 775-76. There was no doubt that the plaintiff had standing to request prospective relief when he filed suit while still on the No Fly List. "The only question" before the Supreme Court was "whether the government's [removal of Mr. Fikre from the No Fly List] suffice[d] to render Mr. Fikre's claims moot." *Id.* at 775. The Court answered in the negative, reasoning that the Government failed to show it would not relist the plaintiff for doing the same or similar things that landed him on the list the first time. *Id.* at 778. The Court explained that "a defendant's 'voluntary cessation of a challenged practice' will moot a case only if the defendant can show that the practice cannot 'reasonably be expected to recur.'" *Id.* at 777 (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)).

Unlike *Fikre*, this case concerns whether Appellants have made the requisite showing of standing. The Supreme Court has made it clear that while a defendant carries the "formidable burden" of showing that a once-live case is now moot, *id.* (quotation omitted), the plaintiff bears the burden of establishing standing at the outset of the litigation, *Friends of*

*the Earth*, 528 U.S. at 190. Thus, contrary to Appellants' arguments, the issue in this case is not whether the Government has satisfied its burden of demonstrating mootness under the voluntary cessation doctrine. Rather, the issue is whether Appellants have satisfied their initial burden of establishing the three elements of standing. As discussed above, Appellants have not. If, unlike the plaintiff in *Fikre*, no Appellant was on a terrorist watchlist when they filed suit, and none of them can show an imminent risk of being placed on a watchlist in the future, then they would not have a "concrete stake" in the litigation sufficient to satisfy the injury-in-fact requirement of standing. *Id.* at 191. The District Court therefore correctly dismissed Appellants' claims for lack of standing.

### D. *Motion for Leave to Amend Complaint*

In the alternative, Appellants argue that the District Court abused its discretion in denying them leave to amend their complaint. Appellants primarily "seek leave to amend to add a request for nominal damages in accordance with the post-original filing holding of *Uzuegbunam v. Preczewski*, that 'nominal damages can satisfy the redressability requirement [of standing] . . . and can keep an otherwise moot case alive.'" Plaintiffs' Opposition to Motion to Dismiss at 38-39, *Jibril v. Mayorkas*, No. 1:19-cv-02457 (D.D.C. May 26, 2022), ECF No. 23 (quoting *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 802 (2021) (Kavanaugh, J., concurring)). In reviewing a district court's denial of a motion to amend a complaint for abuse of discretion, we "requir[e] only that the court base its ruling on a valid ground." *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1099 (D.C. Cir. 1996). A district court "may deny a motion to amend a complaint as futile . . . if the proposed claim would not survive a motion to dismiss." *Id.*

Here, the District Court did not abuse its discretion in holding that Appellants' proposed amendment would be futile. Appellants framed their original complaint as one for prospective relief, suing federal officials in their official capacity and alleging facts relevant to their claims for declaratory and injunctive relief. Belatedly, Appellants now wish to add a request for nominal damages. Yet, because the original complaint was set up to seek prospective relief, Appellants' proposal to seek nominal damages falls short. The complaint does not sue the right individuals, nor does it offer a legal theory or allege the facts necessary to support a claim for retrospective relief.

Appellants' complaint includes claims under the APA, but the APA does not authorize suits seeking "money damages" against the Government. *See* 5 U.S.C. § 702. Appellants also bring claims under the Fourth and Fifth Amendments, but they do not assert a legal theory in support of their damages request for alleged constitutional violations. Although the Supreme Court in *Bivens* has recognized an implied cause of action under the Constitution for monetary damages against federal officials sued in their individual capacities, *Bivens* does not extend to claims against officials sued in their official capacities, as is the case here. *See Kim v. United States*, 632 F.3d 713, 715 (D.C. Cir. 2011) (discussing *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388 (1971)). Furthermore, a *Bivens* claim must "allege that the defendant federal official was personally involved in the illegal conduct." *Simpkins v. Dist. of Columbia Gov't*, 108 F.3d 366, 369 (D.C. Cir. 1997). But consistent with their original request for only prospective relief, Appellants' complaint names only agency heads in their official capacities. Appellants' proposed amended complaint does not name any defendants in their individual capacities, nor does it allege facts

indicating that any of the defendant agency heads personally carried out the allegedly unlawful searches.

In sum, Appellants have not suggested a viable claim for retrospective, monetary relief. Accordingly, the District Court's denial of Appellants' motion for leave to amend their complaint was not an abuse of discretion.

## III. CONCLUSION

For the reasons set forth above, we affirm the dismissal of Appellants' action for lack of Article III standing.

*So ordered.*