# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued March 14, 2024            Decided July 26, 2024

No. 20-1298

ALY ESMAT NEGMELDIN ABDELLATIF, ET AL.,
PETITIONERS

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY, ET
AL.,
RESPONDENTS

———

On Petition for Review of a Final Decision
of the Transportation Security Administration

———

*Jay Gairson* argued the cause for petitioners. With him on the briefs was *Devin T. Theriot-Orr*.

*Joshua P. Waldman*, Attorney, U.S. Department of Justice, argued the cause for respondents. With him on the briefs were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, and *Sharon Swingle*, Attorney.

Before: SRINIVASAN, *Chief Judge*, RAO and PAN, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* SRINIVASAN.

2

SRINIVASAN, *Chief Judge*: After undergoing what he considered an unwarranted airport security screening, Aly Abdellatif suspected that he had been placed (improperly in his view) on one or more government watchlists—lists that flag persons believed to present security risks for more rigorous airport inspections. He sought correction of the watchlists by submitting a redress request to the Transportation Security Administration. The agency responded that it had reviewed Abdellatif's request and made any appropriate corrections to its records. But it declined to confirm or deny whether he was on any watchlist.

Abdellatif and his wife now petition for review of that order. They assert statutory and constitutional challenges to the government's administration of its traveler redress program and to the treatment they receive when traveling. We dismiss their petition in part for lack of standing and otherwise deny it on the merits.

I.

A.

The routine attributes of airport security are well known to travelers: waiting in line, presenting identification, depositing carry-on baggage for a brief x-ray inspection, and passing through a metal detector or body scanner. Occasionally, the process is more involved: a Transportation Security Administration (TSA) agent might pat down a traveler, swab her hands, or manually search her bag. Travelers usually undergo those additional procedures due to random selection or because they packed something that catches an agent's eye.

Sometimes, though, TSA undertakes enhanced security measures pursuant to a less familiar set of policies that single out specific travelers for special scrutiny in the name of

national security. Those policies, called prescreening programs, have as their foundation an array of databases maintained by the government to identify persons who may pose a threat to air travel safety. The Terrorist Screening Dataset (TSDS), a repository of known or suspected terrorists, is one such database. While much about the TSDS remains classified, the government says it includes persons about whom there is "reasonable suspicion" of involvement or intended involvement in terrorist activities. Robinson Decl. ¶¶ 6–7, J.A. 165–66.

The Terrorist Screening Center (TSC), a component of the FBI, maintains the TSDS and sorts it into sub-lists corresponding to different kinds of travel restrictions. *See Jibril v. Mayorkas*, 101 F.4th 857, 862 (D.C. Cir. 2024). Perhaps the best known is the No Fly List. As its name suggests, the No Fly List identifies persons who may not fly "into, out of, within, or over the United States." *FBI v. Fikre*, 601 U.S. 234, 237 (2024). Another, less-restrictive database is the Selectee List. Persons on the Selectee List are not categorically ineligible to board flights but are subject to enhanced security screening at the airport. 49 C.F.R. § 1560.105(b)(2); *see Jibril*, 101 F.4th at 862. TSA implements those restrictions in domestic airports, and it works with air carriers and counterpart agencies to ensure implementation of similar measures at foreign airports for flights that will enter American airspace. 49 U.S.C. §§ 114(h), 44903(j)(2), 44906, 44907.

In addition to facing elevated scrutiny from TSA, a person in the TSDS may be subject to enhanced vetting by U.S. Customs and Border Protection (CBP) when entering the United States. In particular, CBP may conduct "secondary inspection," a screening process more involved than the brief

questioning most people undergo when crossing the border. *See Elhady v. Kable*, 993 F.3d 208, 214–15 (4th Cir. 2021).

TSA administers additional prescreening programs under its exclusive control. Two are centrally at issue here: Quiet Skies, which covers travelers departing from domestic airports, and Silent Partner, which pertains to persons flying into the United States from abroad. Those programs differ from the TSDS in that they are premised on "risk-based rules" rather than individualized investigations of specific persons. Turner Supp. Decl. ¶ 10, A.R. 255. While the details are classified, risk-based rules generally "aim to identify passengers with travel patterns matching intelligence regarding terrorist travel" or persons with travel information "indicat[ing] an elevated risk that [they] may be an unknown or partially-identified terrorist." *Id.* ¶¶ 6, 12 n.10, A.R. 252, 256. Individuals identified by Quiet Skies and Silent Partner face enhanced security screening but (unlike those in the TSDS) are not considered "known or suspected terrorists." *Id.* ¶ 30, A.R. 267.

As noted, a traveler who is on the Selectee List or who triggers application of TSA's risk-based rules typically must undergo "enhanced screening" before boarding a flight that will pass over the United States. 49 C.F.R. § 1560.105(b)(2). Precisely what enhanced screening entails depends on the circumstances. But the usual case, according to the government, lasts 10–15 minutes and involves multiple methods of screening the passenger—i.e., a body scan plus a pat down—as well as "an explosives trace detection" search and a "physical search of the interior of the passenger's accessible property, electronics, and footwear." Turner Decl. ¶ 14, A.R. 231. (TSA does not, however, "search electronic devices for electronic content" in this context. *Id.* ¶ 14 n.13, A.R. 231.) Enhanced screening occurs in the first instance at

an airport security checkpoint but may be repeated in whole or part at a departure gate.

A traveler subjected to enhanced screening or secondary inspection is not necessarily on any kind of watchlist. Quite the contrary: according to the government, "the vast majority of passengers designated by TSA for enhanced security screening are designated as a result of random selection." Turner Supp. Decl. ¶ 3, A.R. 251. Secondary inspection, too, can occur for many reasons, including random selection or because an individual says or does something during a standard inspection that arouses CBP concern.

B.

Congress has instructed TSA to "establish a procedure to enable airline passengers[] who are delayed or prohibited from boarding a flight" due to a prescreening program "to appeal such determination and correct information contained in the system." 49 U.S.C. § 44903(j)(2)(C)(iii)(I); *see id.* §§ 44903(j)(2)(G)(i), 44926. It has likewise directed TSA to "ensure" that the databases it uses to identify passengers for prescreening "will not produce a large number of false positives." *Id.* § 44903(j)(2)(C)(iii)(II).

The Department of Homeland Security (DHS), TSA's parent agency, implements those mandates through the Traveler Redress Inquiry Program (DHS TRIP). 49 C.F.R. §§ 1560.201–1560.207. Overseen by TSA, DHS TRIP enables a traveler who believes she has "been improperly or unfairly delayed or prohibited" from passing through airport security or boarding a flight to submit a redress request. *Id.* § 1560.205(a). On receipt of such a request, TSA, "in coordination with . . . TSC" and other relevant federal agencies, must review the traveler's submission, "correct any erroneous information, and

provide the individual with a timely written response." *Id.* § 1560.205(d).

C.

Aly Abdellatif is an Egyptian citizen who once lived in the United States but has resided abroad since 2014. His wife, Nina Araujo, is a United States citizen, and the couple has three children. Abdellatif and Araujo allege that they and their children are always subjected to enhanced security screening and secondary inspection when traveling through United States airspace or crossing the border. Both have submitted numerous TRIP requests but consider the government's resolution of their inquiries unsatisfactory.

In May 2019, Abdellatif filed the TRIP request giving rise to this lawsuit. TSA replied over a year later with its stock response: a letter stating that it had "researched and completed [its] review" of Abdellatif's case and "made any corrections to records that [its] inquiries determined were necessary, including, as appropriate, notations that may assist in avoiding incidents of misidentification." Letter from Deborah O. Moore, Dir., DHS Traveler Redress Inquiry Program, to Aly Abdellatif (June 4, 2020), J.A. 1. But TSA would "neither confirm nor deny any information about [Abdellatif] which may be within federal watchlists or reveal any law enforcement sensitive information." *Id.* The letter stated that it was a "final agency decision" and that Abdellatif could seek judicial review in a court of appeals, pursuant to 49 U.S.C. § 46110. *Id.* at 2, J.A. 2.

Abdellatif petitioned for review in this court. While he had submitted his TRIP request in his name alone, he and Araujo collectively filed the petition for review on their own behalf and on behalf of their children. They name numerous federal agencies and officers as respondents: DHS, TSA, several non-

TSA DHS components, assorted officials from those agencies, and the Secretary of Transportation.

According to petitioners, their problems stem from Abdellatif's inclusion on both the Selectee List and "TSA's Watch Lists"—in particular, Quiet Skies and Silent Partner. Pet. Br. 1, 18, 33. Petitioners allege that Abdellatif appears on those lists due to "erroneous information and bad algorithms" generated by TSA, and that Araujo and the children "are also included in these data systems as a direct result of their relationship with" Abdellatif. *Id.* at 1. Petitioners believe that TSA's responses to their TRIP requests have been plagued by a fundamental defect in the redress process: TSA ostensibly uses DHS TRIP "merely to correct name conflicts"—i.e., misidentifications—"and not to address erroneous data." *Id.* at 34. In petitioners' account, TSA received Abdellatif's redress requests, confirmed he was in fact the same Aly Abdellatif who allegedly is on the Selectee List and TSA watchlists, and then closed the inquiries, never assessing the accuracy of the information supporting his inclusion on the lists.

We understand petitioners to assert three types of claims rooted in those allegations. First, they contend that respondents administer DHS TRIP in violation of the obligation to provide a redress procedure that "correct[s] any erroneous information." 49 U.S.C. § 44903(j)(2)(G)(i); *see id.* § 44903(j)(2)(C)(iii)(I). Petitioners' theory is that because TSA allegedly does not correct inaccurate information through DHS TRIP, its databases remain inaccurate and produce false positives. Second, petitioners allege that the same defects give rise to a due process violation. And third, petitioners maintain that the enhanced screening and secondary inspections that

they undergo amount to unreasonable searches and seizures in violation of the Fourth Amendment.

As relief, petitioners ask the court to order respondents to "full[y] and adequate[ly] review . . . the information and the algorithms used for identifying threats" and to "correct[] [any] erroneous information" concerning Abdellatif. Pet. Br. 1–2. They also ask that they be permitted to "review and correct erroneous information in TSA's, DHS's, and their components' data systems." *Id.* at 30.

## II.

## A.

At the outset, we dismiss the petition as to all respondents other than TSA. Petitioners bring this action under 49 U.S.C. § 46110(a), which affords a right to seek review directly in the courts of appeals of certain "order[s] issued by" TSA, the Department of Transportation, and the Federal Aviation Administration. The only order under review here is a TSA order, so no other respondent is properly before us. To be sure, our decision in *Ege v. United States Department of Homeland Security*, 784 F.3d 791, 794–95 (D.C. Cir. 2015), mentioned that § 46110(a) permits review of "DHS" orders. But given that TSA is a component of DHS, we take that remark in *Ege* to have meant only that we may review DHS orders under § 46110(a) to the extent those orders pertain to TSA. Because TSA is itself a respondent in this case, there is no basis for the participation of other DHS components. And petitioners are no worse off as a result: none of their claims depends on the presence in this suit of any of the other named respondents.

With that out of the way, we review the rest of the petition only as it concerns TSA.

B.

TSA contends that petitioners lack Article III standing to the extent that their claims turn on Abdellatif's alleged inclusion on the Selectee List. We agree.

"[T]he irreducible constitutional minimum of standing contains three elements." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). A litigant "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). An injury in fact is "an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Id.* at 339 (citation and internal quotation marks omitted).

Petitioners' asserted injury might be conceptualized in two ways: they might be injured by the enhanced screening measures they face when traveling, or they might be injured by the mere fact that TSA maintains inaccurate information about them in its databases. We construe their petition to assert the first kind of harm, because, as to the second, "the mere existence of inaccurate information in a database is insufficient to confer Article III standing." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 434 (2021). Put in standing terms, maintaining erroneous information, without more, does not create a "concrete injury" of the sort Article III requires. *Owner-Operator Indep. Drivers Ass'n, Inc. v. U.S. Dep't of Transp.*, 879 F.3d 339, 344–45 (D.C. Cir. 2018). Petitioners' claims thus can proceed only on the understanding that the harm they

suffer is TSA and CBP's interference with their persons and property.

So understood, petitioners' claims depend in part on Abdellatif's alleged inclusion on the Selectee List. Assuming the truth of petitioners' allegations, Abdellatif's presence on the Selectee List has triggered the enhanced screenings and secondary inspections that form the basis of their Article III injury. And those measures will cease only if Abdellatif is removed from the list.

The difficulty for petitioners is that, even assuming Abdellatif is on the Selectee List, TSA cannot remove him from it. Petitioners bring this petition under § 46110(a), which, for purposes of this case, affords us jurisdiction only over TSA. But as we explained in *Ege*, TSC, not TSA, is the "sole entity with . . . the authority to remove names" from the TSDS (and thus from the Selectee List, which is part of the TSDS). 784 F.3d at 795 (alteration in original) (citation and internal quotation marks omitted). Faced with that disconnect between the proper respondent in a § 46110(a) case (TSA) and the entity that can provide relief to a petitioner who complains he is on the TSDS (TSC), *Ege* perceived a redressability problem: only an order to TSC could remedy such a petitioner's injury, but this court cannot order TSC to do anything in the exercise of its § 46110(a) jurisdiction. *Id.* at 793, 795–96. That is precisely the situation here as well.

While TSC has abrogated *Ege* as to the No Fly List by transferring final decisionmaking authority over that list to TSA, it has not done so for the Selectee List. *See Kashem v. Barr*, 941 F.3d 358, 366 (9th Cir. 2019). Under *Ege*, then, petitioners lack standing insofar as their claims pertain to the

Selectee List, because their injuries in that regard are not redressable in this lawsuit.

Petitioners' effort to plead around *Ege* is unavailing. They insist that they "do not seek delisting from [the TSDS] as a remedy" and instead seek review only of TSA's actions, "data systems[,] and procedures." Pet. Br. 26. But even if petitioners nominally request a remedy running only to TSA, their basic theory of relief concerning the Selectee List necessarily hinges on TSC. They believe TSC added Abdellatif to the Selectee List because of erroneous information TSA generated. And they reason that, if we order TSA to correct its records, TSC will in turn remove him from the Selectee List. In that light, redress of petitioners' injuries—which, recall, must be that they face elevated security measures, not merely that TSA retains inaccurate information about them—requires action from TSC. And just as the necessity of a final TSC decision precluded standing in *Ege*, so too here.

Petitioners run into the same problem with respect to their objection to DHS TRIP's procedures for contesting Abdellatif's alleged inclusion on the Selectee List. Petitioners reason that they should be permitted to bring such a claim because TSA, rather than TSC, "administers" DHS TRIP. Pet. Br. 26. But no matter what we might order TSA to do with respect to DHS TRIP, TSC remains the "sole entity" that can delist Abdellatif and remedy petitioners' concrete injury insofar as it stems from Abdellatif's presence on the Selectee List. *Ege*, 784 F.3d at 795 (citation and internal quotation marks omitted). Indeed, the *Ege* petitioner also challenged the adequacy of DHS TRIP, so *Ege* directly controls on this score. *See id.* at 793, 795–96.

Although our decision in *Ege* compels dismissal of certain aspects of petitioners' claims for lack of standing, *Ege* does not

end this case. *Ege* does not bear on petitioners' claims concerning TSA's prescreening programs, such as Quiet Skies and Silent Partner, because TSA alone controls those programs. Inasmuch as petitioners experience enhanced security screening or secondary inspections because they are on TSA watchlists, then, we could remedy their injuries. Likewise for petitioners' Fourth Amendment claims, to the extent those claims concern the actions of TSA or injuries allegedly flowing from petitioners' inclusion on TSA watchlists. And while TSA challenges our statutory jurisdiction to entertain any of Araujo's claims on the ground that she was not the subject of the order under review, we may assume statutory jurisdiction and resolve her claims alongside Abdellatif's on the merits, which we opt to do. *See Kramer v. Gates*, 481 F.3d 788, 790–91 (D.C. Cir. 2007); *Chalabi v. Hashemite Kingdom of Jordan*, 543 F.3d 725, 728–29 (D.C. Cir. 2008).

III.

We now turn to the merits of petitioners' remaining claims. When reviewing agency actions under § 46110(a), we ask whether the actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Safe Extensions, Inc. v. FAA*, 509 F.3d 593, 604 (D.C. Cir. 2007) (quoting 5 U.S.C. § 706(2)(A)).

A.

Because petitioners premise their statutory and due-process challenges on the same alleged deficiencies in DHS TRIP, we consider those challenges together. Petitioners' central contention is that Abdellatif and Araujo remain on TSA watchlists because TSA did not correct inaccurate information about them when reviewing Abdellatif's TRIP inquiry. That failure, petitioners say, is a function of TSA's alleged policy against correcting errors, a policy that, in petitioners' view,

violates the agency's statutory obligations and the Due Process Clause.

TSA contends that petitioners lack any protected liberty interest in air travel free from enhanced security screening or secondary inspections, and also that Abdellatif has no constitutional rights to assert because he is a non-citizen abroad. But we need not resolve those issues. Even assuming without deciding that TSA is wrong on those scores, petitioners' statutory and due-process challenges to DHS TRIP still fail on the merits.

That is because the record refutes petitioners' contention that TSA does not correct erroneous information in the DHS TRIP process. TSA has submitted a declaration from Stanley Mungaray, Acting Director of DHS TRIP, in which Mungaray explains that DHS TRIP refers redress inquiries to all agencies with relevant equities. Those agencies, Mungaray avers, "thoroughly review the record to determine validity and to correct any erroneous, inaccurate, or untimely information." Mungaray Decl. ¶¶ 6–7, J.A. 36–37. "Other DHS TRIP practitioners," Mungaray further attests, "conduct a similar review, assessing the accuracy and timeliness of any record over which they have ownership, and . . . correct[ing], archiv[ing], or delet[ing] the record, as appropriate." *Id.* ¶ 8, J.A. 37. A declaration from Michael Turner, TSA's Executive Director of Vetting, states that those same procedures "appl[y]" to TSA prescreening programs, including Quiet Skies and Silent Partner. Turner Supp. Decl. ¶ 31, A.R. 268. Turner explains that, after receiving a redress inquiry, TSA analysts "review the DHS TRIP applicant's personal and travel information to determine whether the individual was an appropriate match to the Silent Partner List and/or Quiet Skies List." *Id.* And, he adds, even apart from its review of redress

requests, TSA automatically removes individuals from the Quiet Skies and Silent Partner lists at regular intervals.

Those sworn representations directly rebut petitioners' claims, and petitioners give us no reason to doubt their veracity. True, petitioners cite evidence that the government's various watchlist programs have experienced problems related to data integrity, management, and oversight at various points over several decades. But the fact that the programs have suffered from deficiencies at times does not undermine the evidence that, today, when TSA receives a redress inquiry, it corrects substantive errors. Nor do petitioners make any "showing of bad faith or improper behavior" of a kind that could upset the "presumption of regularity" afforded executive action. *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415, 420 (1971).

Our examination of the ex parte records TSA filed with the court confirms the validity of its public attestations. Those materials demonstrate that after TSA received Abdellatif's TRIP request, it undertook the review it says it typically undertakes and made a reasonable judgment. To be clear: we neither confirm nor deny whether petitioners are or ever have been on any watchlist. We affirm only that TSA's review of Abdellatif's TRIP request conformed to the statutory requirements.

That evidence resolves petitioners' statutory and due-process challenges. TSA is not violating its statutory obligations in the way petitioners allege, and petitioners make no argument that, even if TSA is adhering to statutory requirements, it is nevertheless violating the Due Process Clause.

B.

We also reject petitioners' Fourth Amendment claims. As an initial matter, although petitioners primarily describe their past encounters with TSA and CBP, we take them to challenge searches and seizures they expect to experience in the future if, as alleged, they remain on TSA watchlists. Because petitioners have demonstrated that the threat of those future injuries is "real and immediate," they may proceed on that basis. *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974). Even so, nothing petitioners have alleged amounts to a violation of the Fourth Amendment.

Our ability to analyze petitioners' Fourth Amendment submission is constrained by the generality of their allegations. Petitioners do not recount any specific search or seizure in detail, instead offering only generalized references to "enhanced screenings" and "custodial interviews." Pet. Br. 1, 30–31; Reply Br. 3. We thus are left to infer that they have undergone enhanced screening at the airport along the lines TSA describes, as well as routine secondary inspections when crossing the border. And we assume they will continue to be subject to the same, absent success in this lawsuit.

Operating on those assumptions, we reject petitioners' Fourth Amendment challenge. The Fourth Amendment requires searches and seizures to be reasonable. U.S. Const. amend. IV. "A search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing." *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000). And "[w]here a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, . . . reasonableness generally requires the obtaining of a judicial

warrant." *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995).

In "limited circumstances," however, those "usual rule[s] do[] not apply." *Edmond*, 531 U.S. at 37. Of particular relevance, the Supreme Court has recognized that certain searches conducted entirely without suspicion may be reasonable when "'special needs . . . make the warrant and probable-cause requirement impracticable,' and where the 'primary purpose' of the searches is '[d]istinguishable from the general interest in crime control.'" *City of Los Angeles v. Patel*, 576 U.S. 409, 420 (2015) (second alteration in original) (first quoting *Skinner v. Ry. Lab. Execs. Ass'n*, 489 U.S. 602, 619 (1989); and then quoting *Edmond*, 531 U.S. at 44). Searches meeting that description often are labeled "administrative search[es]." *Elec. Priv. Info. Ctr. v. Dep't of Homeland Sec.*, 653 F.3d 1, 10 (D.C. Cir. 2011).

Airport searches of the kind at issue here fall within the administrative search framework. Their "primary goal is not to determine whether any passenger has committed a crime but rather to protect the public from a terrorist attack." *Id.* Nor could TSA effectively achieve that goal if individualized suspicion, much less a warrant, were required to search a traveler or piece of luggage.

Still, even administrative searches must be reasonable. And to determine whether an administrative search complies with that requirement, we balance "the gravity of the public concerns served by the [search or] seizure, the degree to which the [search or] seizure advances the public interest, and the severity of the interference with individual liberty." *Illinois v.*

*Lidster*, 540 U.S. 419, 427 (2004) (quoting *Brown v. Texas*, 443 U.S. 47, 51 (1979)).

"That balance clearly favors the [g]overnment" for a typical airport search. *Elec. Priv. Info. Ctr.*, 653 F.3d at 10. The public concern served by an airport search is self-evident. "[T]here can be no doubt that preventing terrorist attacks on airplanes is of paramount importance." *United States v. Hartwell*, 436 F.3d 174, 179 (3d Cir. 2006) (Alito, J.). The risk to "hundreds of human lives and millions of dollars of property inherent in the pirating or blowing up of a large airplane . . . *alone* meets the test of reasonableness" for a search "conducted in good faith for the purpose of preventing hijacking or like damage and with reasonable scope." *United States v. Edwards*, 498 F.2d 496, 500 (2d Cir. 1974) (emphasis added) (internal citation omitted); *see Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 675 n.3 (1989); *Chandler v. Miller*, 520 U.S. 305, 323 (1997) ("[W]here the risk to public safety is substantial and real, blanket suspicionless searches calibrated to the risk may rank as 'reasonable'—for example, searches now routine at airports . . . .").

Petitioners also understandably do not dispute that airport searches "advance[] the public interest," in the sense of being reasonably effective at safeguarding what they are designed to protect. *Mich. Dep't of State Police v. Sitz*, 496 U.S. 444, 454 (1990) (citation and internal quotation marks omitted). After all, "it is apparent that airport checkpoints have been effective." *Hartwell*, 436 F.3d at 180.

As for the interference with petitioners' liberty and privacy, the screenings the government describes—relatively confined inspections of person and property—are not so intrusive as to outweigh the vital governmental interests on the other side. We have already held as much in the context of a

particular kind of airport search—an advanced imaging technology full-body scan. *See Elec. Priv. Info. Ctr.*, 653 F.3d at 3, 10. And many courts have approved other standard airport security measures. *See Edwards*, 498 F.2d at 500; *Hartwell*, 436 F.3d at 178–81; *United States v. Skipwith*, 482 F.2d 1272, 1276 (5th Cir. 1973); *United States v. Aukai*, 497 F.3d 955, 958–63 (9th Cir. 2007) (en banc). TSA agents, moreover, do not operate with complete on-the-ground discretion when screening travelers but instead act under a set of standardized operating procedures, mitigating the potential for arbitrary and excessive intrusions on privacy. *See Elec. Priv. Info. Ctr.*, 653 F.3d at 3.

In response, petitioners emphasize that they have been subjected to enhanced screening rather than the standard screening courts have regularly sustained. But the relatively modest differences between the two procedures fail to tip the Fourth Amendment scales against the government. We also recognize that petitioners maintain they have at times been detained for a longer duration than a typical enhanced airport inspection and faced extended questioning. Their allegations in that regard, however, are too threadbare to change the analysis. In the Fourth Amendment context, the Supreme Court has "consistently rejected hard-and-fast time limits" in favor of "common sense and ordinary human experience." *United States v. Montoya de Hernandez*, 473 U.S. 531, 543 (1985) (internal citations and quotation marks omitted). So petitioners' vague allusions to prolonged travel delays, without more, neither afford us a basis to deem any particular incident unreasonable nor give us grounds for assuming anything improper will occur in the future.

Reasonable secondary inspections at ports of entry, including custodial interviews of the sort petitioners describe, likewise may be sustained under the border-search doctrine.

"[T]he Fourth Amendment's balance of reasonableness is qualitatively different at the international border" and "struck much more favorably to the [g]overnment." *Montoya de Hernandez*, 473 U.S. at 538, 540. Routine searches at the border, absent suspicion, thus are permissible "simply by virtue of the fact that they occur at the border." *United States v. Ramsey*, 431 U.S. 606, 616 (1977). While not every border search or seizure fits within that rubric, nothing in petitioners' unspecific allegations that they have experienced secondary inspections, even ones lasting more than an hour, causes us to question the application of the general principle here. *See United States v. Flores-Montano*, 541 U.S. 149, 151, 154–56 & n.3 (2004) (upholding, under border-search doctrine, suspicionless detention of approximately an hour).

Our holding is confined to the level of generality at which petitioners present their claims. We do not give a blanket blessing to any and all airport inspections or border interviews of whatever type or duration. We only conclude that airport security inspections as described in the government's declarations, or interviews at the border of reasonable length and conducted in good faith, do not offend the Fourth Amendment.

\* \* \* \* \*

For the foregoing reasons, we dismiss the petition for review to the extent it challenges Abdellatif's alleged placement on the Selectee List and names improper respondents, and we otherwise deny it.

*So ordered.*