# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued October 10, 2025          Decided April 14, 2026

No. 24-5091

SAAD BIN KHALID,
APPELLANT

v.

TODD BLANCHE, ACTING ATTORNEY GENERAL OF THE UNITED
STATES, U.S. DEPARTMENT OF JUSTICE, IN HIS OFFICIAL
CAPACITY, ONLY, ET AL.,
APPELLEES

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:21-cv-02307)

---

*Gadeir I. Abbas* argued the cause for appellant. With him
on the briefs were *Lena F. Masri* and *Justin Sadowsky*.

*Joshua P. Waldman*, Attorney, U.S. Department of Justice,
argued the cause for appellees. On the brief were *Brian M.
Boynton*, Principal Deputy Assistant Attorney General, at the
time the brief was filed, and *Sharon Swingle* and *Catherine
Padhi*, Attorneys.

Before: HENDERSON, PILLARD and CHILDS, *Circuit
Judges*.

2

Opinion for the Court filed by *Circuit Judge* HENDERSON.

Dissenting opinion filed by *Circuit Judge* PILLARD.

KAREN LECRAFT HENDERSON, *Circuit Judge*: In 2019, Saad Bin Khalid was not allowed to board an Emirates Airline flight from Pakistan to the United States. Hoping to prevent this from recurring, he followed the administrative redress process overseen by the Transportation Security Administration (TSA). The inquiry revealed that Khalid is on the federal government's No Fly List. Designation on the No Fly List is dependent on inclusion in the Terrorist Screening Dataset, often called the Terrorist Watchlist. Thus, Khalid's appearance on the No Fly List indicated to him that he was also on the Terrorist Watchlist.

Khalid thought to challenge both designations—Terrorist Watchlist and No Fly List—in one lawsuit. But a challenge to inclusion on the No Fly List brought after administrative redress is pursued must proceed as a petition for review under 49 U.S.C. § 46110, which grants the circuit court exclusive jurisdiction of TSA Administrator orders. *See Busic v. Transp. Sec. Admin.*, 62 F.4th 547, 549 (D.C. Cir. 2023) (per curiam). The same statutory review scheme does not apply to Terrorist Watchlist claims, however, because the Threat Screening Center (TSC) alone oversees the broader list. *See Ege v. U.S. Dep't of Homeland Sec.*, 784 F.3d 791, 793 (D.C. Cir. 2015) (holding this Court lacks jurisdiction under 49 U.S.C. § 46110 to issue an order binding the TSC). Thus, Khalid's claims split, with the Terrorist Watchlist claims proceeding in the district court and the No Fly List claims separately proceeding as a petition for review in this Court.

In this appeal, Khalid challenges his inclusion on the Terrorist Watchlist. Given the interdependence of the

watchlisting system, a district court's decision favorable to Khalid as to the Terrorist Watchlist would automatically operate to remove Khalid from the No Fly List and thereby set aside a TSA Administrator order. Under Section 46110, as noted *supra*, only the circuit court may take this action (which we today decline to do, *Khalid v. Transp. Sec. Admin.*, No. 23-1150 (D.C. Cir. April 14, 2026)). The district court therefore held it lacks the necessary authority to redress Khalid's injuries and dismissed Khalid's Terrorist Watchlist–related claims for lack of Article III standing. *Khalid v. Garland*, No. 21-cv-2307, 2024 WL 1299339, at *5–6 (D.D.C. Mar. 27, 2024). We now affirm.

## I. Background

### A. The Terrorist Watchlist System

In the aftermath of the September 11, 2001 attacks, the federal government created a multi-agency, consolidated list of suspected-terrorist identity information called the Terrorist Screening Dataset,[1] shortened to the Terrorist Watchlist. *See* Homeland Security Presidential Directive/HSPD-6, Directive on Integration and Use of Screening Information to Protect Against Terrorism, 2 Pub. Papers 1174 (Sep. 16, 2003). In 2024, this list included over one million names. Priv. and C.L. Oversight Bd. (PCLOB), *Report on the Terrorist Watchlist* 8

---

[1] The Terrorist Screening Dataset was formerly known as the Terrorist Screening Database, J.A. 51, and the Threat Screening Center was formerly known as the Terrorist Screening Center, Press Release, Fed. Bureau of Investigation, The Terrorist Screening Center Changes Name to the Threat Screening Center (Mar. 19, 2025), https://www.fbi.gov/news/press-releases/the-terrorist-screening-center-changes-name-to-the-threat-screening-center [https://perma.cc/9R5B-J8S9]. The record and precedent refer to them by the earlier names.

(2025). The Terrorist Watchlist floats in an alphabet soup of government agencies and programs. Courts have steadily digested its intricacies as the precise contours change. It is critical to understand this complex system to determine how an individual may challenge its decisions.

The TSC is an entity administered by the Federal Bureau of Investigation (FBI) in coordination with the Department of Homeland Security (DHS), the Department of State, the Department of Justice and the Office of the Director of National Intelligence. It manages the Terrorist Watchlist. A variety of agencies and foreign allies may nominate an individual for listing and the TSC ultimately determines whether the standard for placement on the list is met. To support a listing, there must be "reasonable suspicion that the individual is a known or suspected terrorist." J.A. 20. Inclusion on the Terrorist Watchlist can lead to supplemental screenings at airports and border checkpoints and can require personal records to undergo additional scrutiny when government benefits or services are sought.

The TSC may also designate individuals on the Terrorist Watchlist for several sub-lists. One sub-list, relevant here, is the No Fly List. Those on the No Fly List may not board flights that are operated by U.S. carriers or that fly over or within U.S. airspace. In addition to meeting the Terrorist Watchlist's reasonable suspicion standard, an individual must meet at least one of four additional criteria for inclusion on the No Fly List. These criteria are that the individual poses:

> (1) a threat of committing an act of international terrorism (as defined in 18 U.S.C. § 2331(1)) or domestic terrorism (as defined in 18 U.S.C. § 2331(5)) with respect to an aircraft

(including a threat of piracy, or a threat to airline, passenger, or civil aviation security);

(2) a threat of committing an act of domestic terrorism (as defined in 18 U.S.C. § 2331(5)) with respect to the homeland;

(3) a threat of committing an act of international terrorism (as defined in 18 U.S.C. § 2331(1)) against any U.S. Government facility abroad and associated or supporting personnel, including U.S. embassies, consulates and missions, military installations (as defined by 10 U.S.C. [§] 2801(c)(4)), U.S. ships, U.S. aircraft, or other auxiliary craft owned or leased by the U.S. Government; or,

(4) a threat of engaging in or conducting a violent act of terrorism and who is operationally capable of doing so.

J.A. 57 (emphasis omitted). An individual cannot be designated for the No Fly List unless he is already on the Terrorist Watchlist, although an individual need not be on the No Fly List to be included on the Terrorist Watchlist.

The TSC distributes information from the Terrorist Watchlist throughout the U.S. government via smaller databases as needed for certain agencies' "respective public missions." J.A. 58; *accord* PCLOB, *supra*, at 24–26. For example, the State Department receives Terrorist Watchlist information for visa and passport screening, Customs and Border Protection (CBP) for vetting travelers to the United States, Citizenship and Immigration Services for immigration screening and the TSA for air passenger screening.

The TSC and nominating agencies periodically review Terrorist Watchlist placements and No Fly List designations to ensure there is sufficient evidence to support the relevant listing. The TSC has authority to remove a person from either or both lists at any time and occasionally does so. *See, e.g.*, *Moharam v. Transp. Sec. Admin.*, 134 F.4th 598, 603 (D.C. Cir. 2025). In addition to these regular reviews, individuals delayed at an airport or denied boarding may initiate an administrative review through the DHS Traveler Redress Inquiry Program (TRIP). 49 C.F.R. § 1560.205. The TSA, which is a subcomponent of DHS, oversees the DHS TRIP. *Id.* § 1560.207.

Before 2015, the inquiry proceeded like this:

> DHS TRIP would forward the complaint to TSC, which would determine whether the complainant was on the No Fly List and, if so, whether the complainant's continued inclusion on the list was justified. After TSC made this determination, DHS TRIP would advise the complainant by letter that the review was complete. These letters neither confirmed nor denied the complainant's status on the No Fly List.

*Kashem v. Barr*, 941 F.3d 358, 366 (9th Cir. 2019). A district court held this system violated due process, *Latif v. Holder*, 28 F. Supp. 3d 1134, 1161 (D. Or. 2014), and, in 2015, the government revised the DHS TRIP, *Fikre v. Fed. Bureau of Investigation*, 35 F.4th 762, 773–74 (9th Cir. 2022).

The DHS TRIP now involves several additional stages of review and greater information sharing with the affected individual. The DHS TRIP program office first forwards all inquiries to the TSC Redress Office to determine whether the

individual is on the No Fly List. This filters out false positives, including any individual who shares a name with a listed individual. The DHS TRIP then notifies the individual by letter whether he is on the No Fly List. Upon receipt, the individual may request additional information about his listing. "If they do so, they will be provided with a letter identifying the specific reason(s) for their listing, as well as an unclassified summary of information supporting that listing." *Id.* at 766. He may then request further consideration of the listing and submit information he believes relevant to the determination. At the end of its review, the TSC may remove the individual from the No Fly List. If the TSC instead believes the individual should remain on the No Fly List, it forwards this recommendation to the TSA Administrator.

The TSA Administrator then conducts an independent review of any information submitted by the individual as part of the DHS TRIP along with all information supporting his listing. On this record, the Administrator determines whether the individual meets the requirements for No Fly List designation. His determination necessarily involves deciding whether the baseline standard for Terrorist Watchlist placement is met because it overlaps with the No Fly List standard. For example, a suspected terrorist includes an individual "reasonably suspected . . . to engage in conduct constituting . . . terrorism," J.A. 20–21, and one who poses "a threat of engaging in or conducting a violent act of terrorism and who is operationally capable of doing so" qualifies for the No Fly List, J.A. 23. Ultimately, the TSA Administrator issues a final order that either keeps the individual on the No Fly List, removes him or remands the inquiry to the TSC for additional information.

"[O]nce the redress process is complete—*i.e.*, the TSA has issued its final order—the TSC continues to independently

review the No Fly List as a matter of course." *Moharam*, 134 F.4th at 604; *see also Fikre*, 35 F.4th at 767. And the TSC maintains authority to remove an individual from the No Fly List outside the TRIP process. Thus, a TSC decision to remove an individual from the No Fly List would supersede the TSA Administrator's final order. *Moharam*, 134 F.4th at 604.

## B. Judicial Review

A complainant who is unhappy with the TSA Administrator's decision may seek judicial review of his final order under 49 U.S.C. § 46110. This provision grants the circuit court "exclusive jurisdiction to affirm, amend, modify, or set aside any part of" an order of the TSA Administrator. *Id.* § 46110(c). Under the pre-2015 redress system, we held that, because "the TSA lacked authority to issue [No Fly List–related] orders, . . . petitions challenging No Fly List determinations presented no redressable injury because we did not have the authority under 49 U.S.C. § 46110 to set those orders aside." *Busic*, 62 F.4th at 549. Now, however, "the TSA Administrator . . . has the authority to issue No Fly List determinations, [and] we have jurisdiction to review [a] petition." *Id.*

Section 46110 does not similarly grant the circuit court exclusive jurisdiction of TSC actions and the TSC alone possesses authority to modify the Terrorist Watchlist. The circuit court's jurisdiction of a No Fly List–related petition for review is thus limited in scope to the TSA. *See Abdellatif v. U.S. Dep't of Homeland Sec.*, 109 F.4th 562, 567–68 (D.C. Cir. 2024) ("[T]his court cannot order TSC to do anything in the exercise of its § 46110(a) jurisdiction."). This means that a ruling ordering the removal of a petitioner from the No Fly List does not automatically operate to void his predicate Terrorist Watchlist placement. Accordingly, a challenge to a No Fly List

designation brought after pursuing the DHS TRIP must proceed as a petition for review in circuit court, *see, e.g.*, *Busic*, 62 F.4th at 550, but a challenge to a Terrorist Watchlist placement must be brought in district court pursuant to general federal question jurisdiction, 28 U.S.C. § 1331.

## C.  Factual and Procedural History

Khalid is a U.S. citizen of Pakistani descent.[2]  As a child, he travelled to and from the United States to visit family members resident here.  From 2012 to 2021, he lived in Pakistan.  In 2022, the U.S. government granted Khalid permission to fly to the United States for repatriation.  He moved to Ohio, where he lived at the time he began this litigation.  His wife and children remained in Pakistan.  He hopes to eventually move his family to the United States and filed a visa application on his wife's behalf in August 2019.  In May 2022, Khalid voluntarily left the United States.

Since 2012, whenever Khalid travelled to the United States, he underwent additional screening measures.  Airport security personnel searched his belongings, inspected his cell phone and required Khalid to undergo lengthy interviews.  In 2019, Khalid was denied boarding an Emirates Airline flight from Pakistan to the United States.

Following this incident, Khalid filed an application with the DHS TRIP.  The DHS TRIP responded by confirming that he is on the No Fly List.  Khalid then asked for additional information.  While awaiting response, Khalid filed this lawsuit in federal district court, challenging his placement on both the

---

[2] We accept as true all well-pleaded factual allegations in the Amended Complaint. *Liff v. Off. of Inspector Gen. for U.S. Dep't of Lab.*, 881 F.3d 912, 918 (D.C. Cir. 2018).

Terrorist Watchlist and No Fly List as violative of substantive and procedural due process, the Administrative Procedure Act and the Religious Freedom Restoration Act. The district court stayed the case pending the outcome of Khalid's DHS TRIP inquiry. *See Shearson v. Holder*, 725 F.3d 588, 594 (6th Cir. 2013) ("There is very little guidance in any Circuit considering administrative exhaustion as it pertains to [the DHS TRIP.]"); *Darby v. Cisneros*, 509 U.S. 137, 145 (1993) (noting that pursuit of an administrative appeal renders the underlying action nonfinal). Eventually, the TSA Administrator issued a Final Order maintaining Khalid on the No Fly List because "he is an individual who represents a threat of engaging in or conducting a violent act of terrorism and who is operationally capable of doing so." J.A. 115. Khalid then amended his Complaint to include facts regarding the resolution of his DHS TRIP inquiry.

The Government thereafter moved to dismiss for lack of jurisdiction. The district court granted the motion as to the No Fly List claims, concluding that Section 46110 divested it of jurisdiction. *Khalid v. Garland*, No. 21-cv-2307, 2023 WL 2561943, at *3 (D.D.C. Mar. 16, 2023). Khalid then moved the court to transfer his claims to this Court—styled as a petition for review—which motion the district court granted. *Khalid v. Garland*, No. 21-cv-2307, 2023 WL 8600506, at *4 (D.D.C. May 25, 2023). By separate opinion, we today dismiss in part and deny in part that petition. *Khalid*, No. 23-1150 (D.C. Cir. April 14, 2026).

The district court retained general federal question jurisdiction of the Terrorist Watchlist claims. 28 U.S.C. § 1331; *see Airline Pilots Ass'n, Int'l v. Civ. Aeronautics Bd.*, 750 F.2d 81, 84 (D.C. Cir. 1984) ("[I]f (as we have held) the district court had no jurisdiction, then this Court could not obtain jurisdiction on appeal."). In ruling on the Government's

dismissal motion, the district court also disposed of some of Khalid's Terrorist Watchlist claims on the merits but denied the motion as to his due process and Administrative Procedure Act claims. *Khalid*, 2023 WL 2561943, at *5–6. The Government renewed its motion to dismiss as to the remaining claims and the district court ultimately granted the motion. *Khalid*, 2024 WL 1299339, at *2, *6. Although it found the delay relating to Khalid's wife's visa caused injury, it determined such injury was not redressable without removing him from the No Fly List, which it lacked jurisdiction to do. *Id.* at *3–5. Khalid timely appealed. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## II. Analysis

The central issue in this appeal is whether Khalid may challenge his placement on the Terrorist Watchlist in district court while simultaneously challenging his placement on the No Fly List here. Because the district court's remedy of removal from the Terrorist Watchlist would operate to "amend, modify, or set aside" the TSA's No Fly List Final Order in contravention of the appellate court's exclusive jurisdiction to do so, 49 U.S.C. § 46110(c), we hold that he may not.

"We review a dismissal for lack of standing de novo." *Renal Physicians Ass'n v. Dep't of Health & Hum. Servs.*, 489 F.3d 1267, 1273 (D.C. Cir. 2007). The "irreducible constitutional minimum of standing contains three elements": (1) injury-in-fact, (2) causation and (3) redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). "[F]or purposes of determining standing, we must assume that [the Appellant] will prevail on the merits of [his] argument." *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 77 (D.C. Cir. 2020). Here, this means that Khalid would be taken off the Terrorist Watchlist. But, as explained *infra*, this remedy is not available.

An injury-in-fact must be "concrete and particularized," and "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (citation modified). Khalid asserts his Terrorist Watchlist status injures him with excessive burdens when entering the United States and with delays in the processing of his wife's immigration visa. The district court relied on the latter injury only.

As to burdens upon entry, the district court held "travel delays and excessive airport screening are not sufficiently likely to recur" because Khalid's No Fly List status prohibits him from flying into or out of the United States entirely. *Khalid*, 2024 WL 1299339, at *4. We agree. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 106–07 (1983); *cf. Jibril v. Mayorkas*, 20 F.4th 804, 814–15 (D.C. Cir. 2021) (finding airport burdens can constitute an injury-in-fact for an individual on the Selectee list, a different Terrorist Watchlist sub-list which permits air travel).

The district court, however, did not discuss the alleged travel burdens at *land* borders. J.A. 18–19, 23. Khalid cannot travel by air into, over and out of the United States while he remains on the No Fly List without an exemption, which the government has indicated it is unlikely to grant. *See* J.A. 127–28 (explaining the "TSA permitted return travel to the United States [in March 2022] for this one instance."); J.A. 107 (denying August 2022 exemption request). Khalid must seek alternative means of entry to or egress from the United States. *See* J.A. 39 (alleging Khalid may have to "drive across the border" to an airport in another country). And he has a history of international travel. Thus, screening burdens at land borders are likely to recur. *See Jibril*, 20 F.4th at 814 (finding an injury-in-fact because petitioners had a "history of traveling to Jordan every two years to visit family" and a "professed desire to continue that pattern"). Because Khalid's alleged land

border burdens are likely to recur, they constitute an Article III injury.

The alleged delay in the processing of Khalid's wife's visa is a separate, sufficient injury-in-fact. "An injury is particularized if it affects the party asserting standing 'in a personal and individual way.'" *Defs. of Wildlife v. Perciasepe*, 714 F.3d 1317, 1323 (D.C. Cir. 2013) (quoting *N.Y. Reg'l Interconnect v. FERC*, 634 F.3d 581, 586 (D.C. Cir. 2011)). Unreasonable processing delay of one's own visa application may constitute an injury. *See* 5 U.S.C. § 706(1). Here, Khalid filed a visa application for his wife. The application, an I-130 Petition for Alien Relative, is submitted by "a U.S. citizen, lawful permanent resident, or U.S. national (who is not a U.S. citizen)" on behalf of his "eligible alien relative." *I-130, Petition for Alien Relative*, U.S. Citizenship & Immigr. Servs. (Nov. 12, 2025), https://www.uscis.gov/i-130 [https://perma.cc/W3G8-DG2W]. Because Khalid himself filed the I-130 application, the alleged delay is sufficiently personal to him to constitute a particularized injury.

The next question is whether the Terrorist Watchlist is the source of his injuries. To satisfy causation, "there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant." *Lujan*, 504 U.S. at 560 (citation modified). CBP conducts "advanced searches" of electronic devices of individuals on "a government-operated and government-vetted terrorist watch list," which the Terrorist Watchlist plainly is. CBP Directive No. 3340-049A ¶ 5.1.4, at 5 (2018), https://www.cbp.gov/sites/default/files/assets/documents/2018-Jan/CBP-Directive-3340-049A-Border-Search-of-Electronic-Media-Compliant.pdf [https://perma.cc/6SYF-WEQ7]; *accord* J.A. 23, 58. And the State Department consults the Terrorist Watchlist when processing visas. J.A.

58. Khalid's Terrorist Watchlist status is a sufficient cause of both his burden and delay injuries then.

Khalid's No Fly List designation may compound these harms. *See Khalid*, 2024 WL 1299339, at *5. The No Fly List constitutes "a" government watchlist under CBP's policy, meaning Khalid's inclusion on it could itself trigger the additional search procedures. CBP Directive No. 3340-049A ¶ 5.1.4, at 5; Oral Arg. at 21:36–21:52. Also, Khalid alleges his visa delays are "a result of his status on the [Terrorist Watchlist] *and* No Fly List." J.A. 38 ¶ 143 (emphasis added); *cf.* J.A. 11 ¶ 7 (attributing this harm to the No Fly List *only*). There is no reason to think that the State Department does not consider a No Fly List designation, which "requires heightened suspicion above the general criterion for inclusion in the [Terrorist Watchlist]," J.A. 121, in making a visa decision. That information is undoubtedly relevant to its "public mission[]." J.A. 58; *see About the U.S. Department of State*, U.S. Dep't of State, https://www.state.gov/about/ [https://perma.cc/8HPZ-JLH3] (last visited Dec. 3, 2025) (including "[t]o protect and promote U.S. security" in mission statement).

The No Fly List is tied to the Terrorist Watchlist under the current framework. Any harm stemming from the No Fly List designation could not occur without the predicate Terrorist Watchlist placement. Khalid's Terrorist Watchlist inclusion is therefore a but-for cause of harm traceable to the No Fly List and sufficient for Article III purposes. *See Honeywell Int'l, Inc. v. Env't Prot. Agency*, 705 F.3d 470, 472 (D.C. Cir. 2013) (finding causation met if injury would not have occurred "but for" the conduct challenged).

Causation and redressability "are often 'flip sides of the same coin.'" *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024) (quoting *Sprint Commc'ns Co.*

*v. APCC Servs., Inc.*, 554 U.S. 269, 288 (2008)). To satisfy redressability, "the asserted injury must be capable of resolution and likely to be redressed by judicial decision." *W. Coal Traffic League v. Surface Transp. Bd.*, 998 F.3d 945, 950 (D.C. Cir. 2021) (citation modified). Ultimately, it is redressability (or the lack thereof) that is fatal to Khalid's standing.

Khalid seeks removal from the Terrorist Watchlist.[3] This remedy would redress his alleged injuries in full, no matter the precise listing that causes them, because it would simultaneously remove him from the No Fly List. And the district court has jurisdiction of the TSC which, because it is solely responsible for Terrorist Watchlist inclusion/exclusion, can effectuate this remedy. Nevertheless, "even where a plaintiff requests relief that would redress h[is] claimed injury, there is no redressability if a federal court lacks the power to issue such relief." *M.S. v. Brown*, 902 F.3d 1076, 1083 (9th Cir. 2018); *accord Seed v. Env't Prot. Agency*, 100 F.4th 257, 263 (D.C. Cir. 2024). And the district court lacks the requisite power.

When the TSA Administrator conducts the final stage of a DHS TRIP inquiry, he reviews the entirety of an individual's file to determine whether the evidence supports a No Fly List designation.[4] Critically, the No Fly List standard incorporates

---

[3] Khalid also, indeed principally, seeks removal from the No Fly List, J.A. 46–47; Appellant's Br. 23, notwithstanding that is a remedy the district court cannot grant here. *See* 49 U.S.C. § 46110(c).

[4] In fact, an early stage of the DHS TRIP includes the TSC Redress Office's determination of "whether or not the identity in the [Terrorist Watchlist] continues to satisfy the criteria for inclusion or should be removed or have its status otherwise modified." J.A. 61.

the Terrorist Watchlist standard.[5]  J.A. 121 n.1 (explaining the No Fly List criteria are "in addition to" the Terrorist Watchlist reasonable suspicion standard); J.A. 165–66 ¶ 11 (same); Gov't Accountability Off., *Terrorist Watchlist: Nomination and Redress Processes for U.S. Persons* 2 (2025) (same).  This means one cannot be on the No Fly List without evidence also supporting Terrorist Watchlist placement.  Thus, in finding that Khalid meets the standard for No Fly List designation, the TSA Administrator also must be satisfied that he meets the reasonable suspicion standard.[6]  And a TSA official noted that Khalid is "on the No Fly List because he presents both the threat required for inclusion in the [Terrorist Watchlist] as a known or suspected terrorist and the threat meeting heightened criteria for placement on the No Fly List."  J.A. 129.

Any remedy that removes Khalid from the Terrorist Watchlist would violate the TSA Final Order affirming Khalid's No Fly List designation and thereby set it aside, something only the circuit court may do under Section 46110.

---

And when the TSA conducts its final review, it looks at the "complete DHS TRIP file."  J.A. 67.

[5]  Khalid alleges that sub-lists, including No Fly List designation, are "based on distinct criteria from [the Terrorist Watchlist's] overall inclusion standard." J.A. 22 ¶ 43.  Granted, an individual must meet unique criteria for No Fly List designation beyond what is required for the Terrorist Watchlist but he must nonetheless meet *both* standards.

[6] The dissent notes that "[n]othing in the record establishes that the TSA assesses Watchlist eligibility as a component of its No Fly List review." Dissenting Op. 12. If our colleague means there is no explicit language in the record reflecting that "TSA assesses Watchlist eligibility" in its No Fly List review, her notation is correct but immaterial. The record as a whole necessarily implies that that examination has to occur.

17

Thus, the remedy Khalid seeks would improperly usurp our jurisdiction of the TSA Administrator's Final Order, *see City of Rochester v. Bond*, 603 F.2d 927, 931 (D.C. Cir. 1979) (noting special statutory review schemes are ordinarily meant to be "the exclusive means of obtaining judicial review in those cases to which [they] appl[y]"), and conflict with today's decision to uphold the Final Order affirming Khalid's No Fly List designation, *Khalid*, No. 23-1150 (D.C. Cir. April 14, 2026). Consequently, the district court lacks authority to redress Khalid's Terrorist Watchlist–related injuries while he remains on the No Fly List pursuant to the TSA Administrator's Final Order.[7] Because Khalid lacks an essential element of standing, the district court does not have subject-matter jurisdiction to hear his claims. *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987).

The district court—at Khalid's insistence—reluctantly contemplated a remedy that removes Khalid from the Terrorist Watchlist while leaving the TSA Administrator's No Fly List decision intact. *Khalid*, 2024 WL 1299339, at *5. If the two designations were truly separate, this might be enough to satisfy redressability. *See Cap. Power Corp. v. Fed. Energy Regul. Comm'n*, 156 F.4th 644, 650 (D.C. Cir. 2025) ("When a litigant's injury-in-fact stems from two independently sufficient causes, it may separately challenge both of them,

---

[7] The dissent argues this result "places our circuit in tension with other courts interpreting section 46110." Dissenting Op. 10. However, the cases cited are distinguishable because neither involved an active TSA final order. *Mokdad* dealt with the pre-2015 DHS TRIP in which TSA had no role in No Fly List decisions. 804 F.3d at 812. And the TSC officially notified the appellant in *Fikre* that he had been removed from the No Fly List during litigation. 35 F.4th at 767. Our sister circuits therefore did not have occasion to consider whether a Terrorist Watchlist challenge could proceed in district court when a related TSA final order is in effect.

even though success in only one proceeding might not fully redress its injury."). That remedy is not possible here, however, given the interrelated nature of the Terrorist Watchlist and the No Fly List, along with their respective inclusion standards, as described *supra*. Although the government must at times revise its programs in response to judicial rulings, as it did regarding the DHS TRIP in 2015, we are without authority to prompt such a change here. The district court's inability to redress Khalid's injuries at this time does not allow for a forced decoupling of the No Fly List from the Terrorist Watchlist.

The Government, relying on *Telecommunications Research and Action Center v. FCC* (*TRAC*), 750 F.2d 70 (D.C. Cir. 1984), asserts that the lack of redressability suggests this court is the proper one for Khalid's Terrorist Watchlist challenge. Appellee's Br. 21–22. But *TRAC* does not support this position. In that case, we held that when the Congress vests the appellate court with review of an agency action, it "manifest[s] an intent that the appellate court exercise sole jurisdiction over the class of claims covered by the statutory grant of review power." 750 F.2d at 77. This is intended to "eliminate[] duplicative and potentially conflicting review." *Id.* at 78. Under that reasoning, the Government argues, we could hear a challenge to the TSC's placement of an individual on the Terrorist Watchlist as part of our review of the TSA's decision to maintain that individual on the No Fly List. *See* Appellee's Br. 20–21. But such an exercise of jurisdiction by the appellate court would go far beyond *TRAC*'s holding. *TRAC* does not suggest our exclusive jurisdiction extends to an agency or to an action other than those set forth in the applicable statutory provision, in this case, 49 U.S.C. § 46110. Under this provision, the exclusivity of our jurisdiction begins and ends, as relevant, with the TSA. Challenges to TSC action fall outside the class of claims that Section 46110 covers.

Consequently, we cannot exercise jurisdiction of the Terrorist Watchlist claims as would be the case for challenges falling under *TRAC* and its progeny.

The Government further reasons that Khalid's challenges to the Terrorist Watchlist are inextricably intertwined with the No Fly List challenges that *are* reviewable by this Court. Appellee's Br. 20. Therefore, the Government argues, his Terrorist Watchlist claims "cannot be heard in district court." Appellee's Br. 27. But this fails for the same reason that reliance on *TRAC* fails. This Court has never extended the inextricable intertwinement doctrine to sweep in different parties or agency actions. *Ege*, 784 F.3d at 796; *see also Mokdad v. Lynch*, 804 F.3d 807, 814 (6th Cir. 2015) (calling intertwinement of two agencies' orders "an unprecedented departure from the doctrine of inescapable intertwinement").

Fundamentally, Khalid faces an ordering problem. To challenge his Terrorist Watchlist placement while a related No Fly List order is in effect, he must first seek removal from the No Fly List in circuit court; if successful, he can seek removal from the Terrorist Watchlist in district court. At that time, with the TSA Final Order vacated, there would be no jurisdictional barrier to the district court's grant of a Terrorist Watchlist–related remedy. And that remedy would fully redress any remaining harms. It is not unprecedented for a jurisdictional scheme to require "plaintiffs to file two actions in different courts to obtain complete relief in connection with one set of facts." *United States v. Tohono O'Odham Nation*, 563 U.S. 307, 323 (2011) (Sotomayor, J., concurring in the judgment). And the actions may have to "proceed sequentially rather than simultaneously" to do so. *Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2662 (2025) (mem.) (Barrett, J., concurring in the partial grant of the stay). This is precisely what the jurisdictional scheme at issue here requires.

Although Khalid acknowledges this course of action, he refuses to accept it. He argues that such a result "insulate[s] the[] watchlist from challenge." Appellant's Br. 32. There is, of course, a "presumption favoring judicial review of administrative action." *Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 623 (D.C. Cir. 2020) (quoting *Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 229 (2020)). But review of his Terrorist Watchlist–related claims is only temporarily unavailable rather than completely precluded. *Cf.* 5 U.S.C. § 701(a) (recognizing some agency actions are in fact unreviewable).

Khalid holds the key to free himself from his ostensible legal limbo. On this point our dissenting colleague agrees. *See* Dissenting Op. 13–14. He can seek reconsideration of his No Fly List designation upon any future airport delay, denial of boarding or additional burden at a border crossing. The TSC would evaluate a future DHS TRIP inquiry anew, considering a different factual record at a different point in time. That inquiry may result in the No Fly List removal Khalid desires and open the door to a related Terrorist Watchlist challenge. The TSC will also continue to review periodically Khalid's Terrorist Watchlist inclusion under its standard operating procedures. The dissent notes this practice ensures the "window of circuit-court exclusivity is inevitably brief."[8] Dissenting Op. 13. If Khalid chooses not to again engage DHS TRIP, he can "immediately," Dissenting Op. 14, bring a new challenge to the superseding TSC Terrorist Watchlist decision that does not implicate the TSA Final Order at issue. That said, we decline today to look beyond the Amended Complaint to consider whether superseding agency action supports the

---

[8] Of course, it was in that brief window that Khalid filed his Amended Complaint. *Compare* J.A. 91 (showing TSA Final Order was issued on June 9, 2022), *with* J.A. 4 (showing Amended Complaint was filed on June 29, 2022).

district court's jurisdiction. Accordingly, Khalid's Terrorist Watchlist claims are reviewable in district court only at a point further down the correct procedural path.

\* \* \*

For the foregoing reasons, the district court's judgment of dismissal is affirmed.

*So ordered.*

PILLARD, *Circuit Judge*, dissenting: Saad bin Khalid sued to challenge the Threat Screening Center (the Center)'s decision to place him on the terrorist watchlist. As the majority explains, Khalid raises statutory and constitutional claims ordinarily within the district court's general federal-question jurisdiction. Maj. Op. at 9 (citing 28 U.S.C. § 1331). No statute divests the district court of jurisdiction over claims challenging placements on the terrorist watchlist. And I agree with the majority that Khalid alleges concrete injuries, Maj. Op. at 12-13, for which the district court "can effectuate [a] remedy" by ordering the Threat Screening Center to remove him from the list, Maj. Op. at 15.

It follows from those premises that the district court may review Khalid's claims. The majority, however, disagrees. Pointing to a statute that vests our court with exclusive jurisdiction over direct appeals of certain orders of a different federal agency—the Transportation Security Administration (TSA)—the court holds that the district court lacks authority to remedy Khalid's injury. Maj. Op. at 16-17 (citing 49 U.S.C. § 46110(c)). It reasons that the district court cannot exercise its own jurisdiction over Khalid's claim regarding the Center's watchlist decision because doing so would interfere with this court's exclusive jurisdiction to review the TSA order retaining Khalid on the No Fly List. But a district court order granting Khalid relief from the watchlist would neither modify nor set aside TSA's order. It would instead set aside an order of the Center. If, in doing so, the district court moots the TSA order, that is a permissible consequence of the government's allocation of agency authority—not a reason to curtail the jurisdiction of the only court that can review the Center's terrorist watchlisting order. Because I disagree that our jurisdiction over final orders of TSA precludes district court jurisdiction over the Center's terrorist watchlist decisions, I respectfully dissent.

**I.**

This case centers on an unusual relationship between two federal agencies: the Threat Screening Center and TSA. I begin with a brief recap of the relevant facts.

The Center is a multi-agency clearinghouse for foreign and domestic federal intelligence information. To that end, the Center maintains the terrorist watchlist—a centralized database of known and suspected terrorists. The Center alone has authority to add and remove names on the terrorist watchlist. And the Center regularly audits the terrorist watchlist, including biannually reviewing all listings of U.S. citizens.

Various authorized federal agencies and officials use the database as a vetting and screening tool "for diplomatic, military, intelligence, law enforcement, immigration, transportation security, visa, and protective processes." U.S. Gov't Watchlisting Process Overview at 5 (Sept. 2020) (J.A. 58). To assist them, the Center creates sub-lists of the terrorist watchlist that serve specific purposes. One such sub-list is the No Fly List, which the Center maintains for TSA. Again, the Center alone has authority to add a person to the No Fly List. The Center does so when a person on the terrorist watchlist meets one of four additional criteria, such as posing a threat of committing an act of terrorism involving an aircraft. *See id*. at 4 (J.A. 57). The Center also regularly audits the No Fly List, removing individuals who no longer meet the selection criteria.

In one limited circumstance, TSA has concurrent power with the Center to remove a person from the No Fly List. Pursuant to a Department of Homeland Security rule, 49 C.F.R. § 1560.205, TSA oversees a redress process, DHS TRIP, through which impeded air travelers may seek review of their No Fly List status. Once a traveler initiates a query through DHS TRIP, TSA asks the Center to confirm whether the

traveler is, indeed, on the No Fly List. The vast majority (around 98%) of DHS TRIP inquiries are "found to be cleared of any connection with terrorist watchlisted identities" in that initial step because it turns out the traveler is not in fact a positive match to an identity in the database, and in that case his DHS TRIP process then ends. U.S. Gov't Watchlisting Process Overview at 8 (J.A. 61). For the rare query that results in verification that the traveler is on the No Fly List, the Center also confirms internally whether the traveler continues to satisfy the terrorist watchlist and No Fly List criteria. If, after all those steps, the Center determines that the traveler is properly listed, it so notifies TSA. TSA then provides an opportunity for the traveler to "request and receive additional information regarding [his] status," which may include the general basis for inclusion on the No Fly List. U.S. Gov't Watchlisting Process Overview at 9 (J.A. 62).

If the traveler opts for the additional information, TSA asks the Center to prepare an unclassified summary of the materials underlying the traveler's No Fly List designation. TSA then shares the summary with the traveler. The traveler may submit a response, which TSA forwards to the Center. The Center, upon reviewing the new information, can either remove the traveler from the No Fly List or prepare "a recommendation to the TSA Administrator" indicating that the traveler "should remain on the No Fly List and [providing] the reasons for that recommendation." Mungaray Decl. ¶ 7 (J.A. 67). The Center forwards that recommendation to DHS TRIP, which "provides the recommendation to the TSA Administrator along with the person's complete DHS TRIP file." *Id.* ¶ 8. The TSA Administrator then issues a final order either (1) maintaining the traveler on the No Fly List, (2) removing him from the No Fly List, or (3) "remand[ing] the case back to [the Center] with a request for additional

information or clarification." U.S. Gov't Watchlisting Process Overview at 9 (J.A. 62).

The existence of that third option underscores an important caveat: The "complete DHS TRIP file" that TSA reviews represents information collected by DHS TRIP, not the full body of evidence available to the Center. Although the TSA Administrator can make a "request for additional information or clarification" from the Center, *id.*, the government does not contend—nor does the record in this case establish—that the Center routinely gives TSA its entire file of information bearing on the traveler's placements. Instead, the TSA Administrator issues his order using "information available to [TSA]," *see* Letter from David P. Pekoske, TSA Administrator, to Saad bin Khalid (June 9, 2022) (J.A. 112)—primarily, information that the traveler submits through the DHS TRIP process and recommendations passed along from the Center, *see* U.S. Gov't Watchlisting Process Overview at 9 n.5 (J.A. 62) (describing the DHS TRIP file as "the information the traveler submits to DHS TRIP" plus "other available information that is being relied upon to support the No Fly listing"); Mungaray Decl. ¶¶ 7-8 (J.A. 67).

Notably, during the DHS TRIP process, the TSA Administrator never purports to decide whether a traveler belongs on the broader terrorist watchlist. Instead, TSA forwards that question to the Center at the outset of a DHS TRIP inquiry and relies on the Center's response as a premise of the rest of its review. The majority suggests that the Center's files regarding the traveler's terrorist watchlist status become part of the "complete DHS TRIP file" because the Center confirms during the DHS TRIP process that the traveler is properly watchlisted. Maj. Op. at 15-16 n.4. But the Center is a separate entity from DHS TRIP, and government procedures specify when information passes between the two. *See* U.S.

Gov't Redress Implementation Plan for USPER No Fly Individuals at 3-5 (TSA A.R. 225-227), *Khalid v. Transp. Sec. Admin.*, No. 23-1150 (D.C. Cir. April 14, 2026) (explaining that DHS TRIP "refers [a] case" to the Center, the Center works with the nominating agency "to assess the derogatory information," and the Center then "advise[s] DHS TRIP of [any] change in status" resulting from the inquiry.) The Center answers watchlist questions internally and returns answers—not complete records of the underlying intelligence information—back to DHS TRIP.

A final order issued through DHS TRIP reflects TSA's judgment of the propriety of a traveler's No Fly listing at a particular moment in time. After TSA issues a final TRIP order, the Center remains free to follow its usual auditing practices for both the No Fly List and terrorist watchlist, including removing an individual whom TSA may have just decided to retain on the No Fly List, *see Moharam v. Transp. Sec. Admin.*, 134 F.4th 598, 602-04 (D.C. Cir. 2025), or, as Khalid suggests, re-adding an individual whom TSA ordered removed, Compl. ¶ 57 (J.A. 25). A traveler may invoke the DHS TRIP review process anew any time he experiences an air travel impediment, and the TSA Administrator will re-evaluate the propriety of his No Fly List placement at that point in time.

## II.

This appeal concerns the Center's decision to maintain Khalid on the terrorist watchlist. As explained, the Center bears primary responsibility for creating and auditing both the terrorist watchlist and the No Fly List. The Center is thus the natural object of a plaintiff's concerns about his placement. That default rule has one exception. In the rare case in which TSA, because of DHS TRIP, issues an order concerning a No Fly List placement, our court has "exclusive jurisdiction to

affirm, amend, modify, or set aside any part of" that order. 49 U.S.C. § 46110(c). We exercise that jurisdiction today to review the TSA Final Order maintaining Khalid on the No Fly List. *Khalid v. Transp. Sec. Admin.*, No. 23-1150 (D.C. Cir. April 14, 2026)). But our review of that TSA Final Order makes no difference to the district court's authority to review the Center's separate decision to keep Khalid on the terrorist watchlist. To resolve Khalid's watchlisting claim, the district court would exercise authority over a distinct agency deciding a discrete matter never before us in our review of the TSA No Fly List order. I would accordingly reverse the district court's dismissal of Khalid's terrorist watchlist claims and remand for that court to decide them.

The majority reaches a different result. My colleagues reason that a district court decision removing Khalid from the terrorist watchlist would have the legal effect of "set[ting] aside" the TSA Final Order—something that only our court may do. Maj. Op. at 16. They also suggest that, if the district court were to review Khalid's terrorist watchlist status, it might reach a decision that factually contradicts the one we make to resolve Khalid's section 46110 petition for No Fly List review. But a district court order removing Khalid from the terrorist watchlist would conflict neither legally nor factually with our exercise of exclusive jurisdiction over the TSA Final Order determining Khalid's No Fly List status.

**A.**

Start with the supposed legal conflict. The majority reasons that, because a district court order removing Khalid from the terrorist watchlist would also remove Khalid from the No Fly List, such an order would "violate the TSA Final Order" and "improperly usurp" our exclusive jurisdiction. Maj. Op. at 16-17. I disagree. I also find the majority's focus on

preserving the relevance of the TSA Final Order to be at odds with the limited role of TSA and DHS TRIP in the watchlisting process.  The Center, after all, is the primary and continuous keeper of both the terrorist watchlist and the No Fly List.  It makes no sense to foreclose review of the Center's watchlisting decision in order to safeguard TSA's one-off DHS TRIP order.

Section 46110 grants us exclusive jurisdiction to review the TSA Final Order, *see Busic v. Transp. Sec. Admin.*, 62 F.4th 547, 549 (D.C. Cir. 2023), and so bars the district court from reviewing that Order.  An exclusive review provision may make certain related matters reviewable in our court, and when it does so, our jurisdiction over the related matters is also exclusive.  *See Telecomm. Rsch. & Action Ctr. v. FCC* (*TRAC*), 750 F.2d 70, 76-78 (1984).  But my colleagues correctly reject the government's arguments that section 46110 brings the Center's terrorist watchlist decision within the ambit of our review of TSA's distinct No Fly List decision.  Maj. Op. 18-19 (rejecting arguments based on "*TRAC* and its progeny" and the "inextricably intertwined" doctrine).  The government does not contend that section 46110 otherwise affects the district court's general federal question jurisdiction.

We all agree that, in exercise of its federal question jurisdiction of challenges to the terrorist watchlist, the district court can issue relief that runs against the Center.  *See* Maj. Op. at 15.  As relevant here, if the district court were persuaded by the merits of Khalid's challenge to his placement on the terrorist watchlist, it could redress his injuries by ordering the Center to remove Khalid from that list.  Such relief would run only against the Center, not TSA.  To my mind, it is clear that the district court could thus provide Khalid relief without usurping our exclusive authority to review and modify TSA's final orders.  We alone can consider Khalid's challenge to

TSA's determination, pursuant to DHS TRIP, that Khalid belongs on the No Fly List.

To be sure, a district court order crediting Khalid's claim against the Center and redressing it by removing him from the terrorist watchlist would have the practical effect of mooting the TSA Final Order sustaining Khalid's No Fly listing. We all agree that, if Khalid is off the watchlist, he cannot be on the No Fly List. Maj. Op. at 18. In my view, however, section 46110 provides no protection against ordinary chances of mootness. That is just as true here as, for example, under the statute giving our court exclusive jurisdiction to review a Federal Communications Commission order placing conditions on a merger, 47 U.S.C. § 402(b), *see Competitive Enter. Inst. v. Fed. Commc'ns Comm'n*, 970 F.3d 372, 380 (D.C. Cir. 2020), which surely has no bearing on the district court's antitrust jurisdiction to review the validity of the underlying merger, *see* 15 U.S.C. §§ 18, 25, even though the Federal Communications Commission "duplicates the analysis of the Department of Justice in its review of possible anticompetitive effects," *Comp. Enter. Inst.*, 970 F.3d at 377. So too for the multitude of other special statutory review provisions: I am aware of none that bars the district court from reviewing a claim that might incidentally moot a petition before our court. Indeed, in the context of section 46110, our court has held that the Center itself can moot a petition for review of a TSA Final Order by removing the petitioner from the terrorist watchlist (and thus the No Fly List). *Moharam*, 134 F.4th at 602-04 (D.C. Cir. 2025). It follows that the district court equally can order the Center to take such action even if it thereby moots a petition for review in our court.

Note that it is only because of the government's voluntary arrangements that such a district court order would moot any further dispute about the TSA Final Order. The government

has set up the DHS TRIP process such that two distinct agencies' decisions must overlap to support a No Fly List placement: the Center's original and ongoing decision that the person meets both the terrorist watchlist and the No Fly List criteria, and TSA's separate decision, pursuant to DHS TRIP, that the person is correctly on the No Fly List. Section 46110(c) gives us sole jurisdiction to review TSA orders resulting from DHS TRIP, whereas the district court has federal question jurisdiction over the Center's placement and retention decisions. The government's decision to condition the practical effectiveness of a TSA Final Order on the traveler's remaining on the Center's terrorist watchlist makes no difference to that equation. Section 46110 is a grant of judicial review power; it is not a shield that prevents review of any action that might upset the continued operation of the TSA Final Order.

The majority ultimately reads section 46110 to strip the district court of more jurisdiction than it confers on this court. That means that neither we nor the district court can review Khalid's claims that the Center improperly placed him on the terrorist watchlist. Khalid faces more than an "ordering problem": My colleagues say that he must prevail on his No Fly List claims before he can get review of the Center's upstream terrorist watchlisting decision. Maj. Op. at 19. The government never makes that argument, and for good reason. It runs contrary to the "well-settled" "presumption favoring interpretations of statutes [to] allow judicial review of administrative action." *Kucana v. Holder*, 558 U.S. 233, 251-52 (2010) (modification in original) (quoting *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 63-64 (1993)) The presumption favoring judicial review "can be overcome only by 'clear and convincing evidence' of congressional intent to preclude judicial review." *Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 624 (D.C. Cir. 2020) (quoting *Kucana*, 558 U.S. at 252). Yet

nothing about section 46110, a forum specification, suggests that Congress intended to foreclose judicial review of any otherwise-reviewable agency action. Indeed, the result that the majority announces today places our circuit in tension with other courts interpreting section 46110. *See Mokdad v. Lynch*, 804 F.3d 807, 812-15 (6th Cir. 2015); *Fikre v. Fed. Bureau of Investigation*, 35 F.4th 762, 774-775 (9th Cir. 2022), *aff'd on other grounds*, 601 U.S. 234 (2024).

Rendering the Center's watchlist decision judicially unreviewable to shield a decision of this court sustaining a TSA Final Order is especially perverse because the Center, not TSA, is the nerve center of the watchlisting operation. The Center makes all watchlisting and No Fly listing decisions in the first instance. It affords TSA a limited window into its work for purposes of DHS TRIP. Congress never meant the circuit court's exclusive review—peering through that limited window—to block the district court from opening the door to scrutiny of the primary operation.

**B.**

Next, consider the factual concern that appears to animate the court's holding: a worry that the district court's review of the Center's terrorist watchlist decision could factually duplicate (and potentially "conflict with," Maj. Op. at 17) our review of the TSA Final Order. My colleagues suggest that the TSA Final Order, which all agree is subject to our review, reflects a determination by TSA that Khalid belongs on the terrorist watchlist—implying that our review of the No Fly listing effectively addresses the propriety of the terrorist watchlisting as well. To prevent the district court from "usurp[ing]" our exclusive jurisdiction to adjudicate the facts underlying the TSA order, Maj. Op. at 17, my colleagues read section 46110 tacitly to strip the district court of jurisdiction to

hear Khalid's challenge to his watchlist placement. But neither of the reasons my colleagues offer to show that the district court's review would duplicate our own is supported by the record.

First, the majority says that the TSA Administrator "must be satisfied" that a person belongs on the terrorist watchlist as a precondition of approving that traveler's inclusion on the No Fly List. Maj. Op. at 16. True, the No Fly List is limited to people who are already on the broader terrorist watchlist. But the Center alone is responsible for maintaining the accuracy of the terrorist watchlist, and the record indicates that the TSA Administrator treats a traveler's terrorist watchlist status as a premise of—rather than a threshold issue within—its own review. In Khalid's case, for instance, the TSA Final Order identifies one of the four No Fly List criteria as the basis for Khalid's No Fly List placement, but it does not identify the basis for his inclusion on the broader terrorist watchlist or even mention the criteria for inclusion on that list. David P. Pekoske, TSA Administrator, Notice of Final Order and Decision of the TSA Administrator at 2 (June 9, 2022) (J.A. 114).

The government, for its part, has never represented that TSA independently verifies travelers' eligibility for the terrorist watchlist. The majority implies otherwise by quoting a TSA employee's conclusory assertion, in a litigation affidavit, that Khalid meets the criteria for the terrorist watchlist. Maj. Op. at 16 (quoting Turner Decl. ¶ 30 (J.A. 129)). We know that TSA receives and considers the Center's recommendation to retain the traveler on the No Fly List, which implicitly reflects the Center's determination that the traveler belongs on the terrorist watchlist. But the affiant does not say that TSA examined the underlying information regarding Khalid's eligibility for the terrorist watchlist. To the contrary,

the affiant states that he relies on "information made available to [him] in [his] professional capacity," such as the list of criteria that the Center uses to compile the terrorist watchlist. Turner Decl. ¶ 1 (J.A. 120). Nothing in the record establishes that TSA assesses watchlist eligibility as a component of its No Fly List review. I see no basis for inferring that TSA undertakes such an assessment, *see* Maj. Op. at 16 n.6, when the record elsewhere spells out the Center's exclusive authority over the contents of the terrorist watchlist, *see* U.S. Gov't Watchlisting Process Overview at 6 (J.A. 59).

Second, taking an indirect approach, the majority asserts that anyone who meets one of the four No Fly List criteria "necessarily" meets the "baseline standard" for the terrorist watchlist. Maj. Op. at 7. That, too, is a claim the government has never advanced, and comparison of the two lists' criteria does not clearly support it. The terrorist watchlist criteria focus on evidence of a person's terroristic acts or intent, while the No Fly List criteria focus on whether an individual poses a "threat" of certain acts of terrorism, including because he is "operationally capable" of carrying them out. U.S. Gov't Watchlisting Process Overview at 4 (J.A. 57). And even if the No Fly List standard fully encompassed the terrorist watchlist standard, we have no reason to treat the TSA Administrator's Final Order as validating the Center's decision to place Khalid on the terrorist watchlist. The "entirety of an individual's file" within DHS TRIP, Maj. Op. at 15, is not necessarily the same as the entirety of the Center's file supporting the watchlist designation. As explained, the Center has access to a distinct and larger body of evidence, some of which might undermine inferences on which the TSA Administrator relied.

The Center's decision to maintain Khalid on the terrorist watchlist is factually distinct from the decision reflected in the TSA Final Order. Accordingly, the district court may review

the Center's decision without re-ploughing ground this court has covered. To the extent the government can show otherwise, it is free to assert issue preclusion, which "generally bars 'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment.'" *Gulf Power Co. v. Fed. Commc'ns Comm'n*, 669 F.3d 320, 323 (D.C. Cir. 2012) (quoting *New Hampshire v. Maine,* 532 U.S. 742, 748-49 (2001)). But even if we sustained TSA's No Fly List decision based on the DHS TRIP record, the district court could consistently determine, in view of the larger body of information before the Center, that retention of the same individual on the watchlist was insupportable.

## III.

The effect of the majority's error is more limited than some of its language might suggest. The majority bars Khalid from bringing terrorist watchlist claims in district court while a final order of TSA governs Khalid's placement on the No Fly List. But that window of circuit-court exclusivity is inevitably brief. Recall that the Center "conducts a biannual review for all U.S. person[s]" on the terrorist watchlist and No Fly List. U.S. Gov't Watchlisting Process Overview at 6 (J.A. 59). Our court has made clear that the Center's updated decisions supersede previous listing orders, including orders of the TSA Administrator. *Moharam*, 134 F.4th at 604. That result makes sense: Each time the Center makes a new decision, additional evidence may have accumulated, and the passage of time may have eroded the probative force of existing evidence.

Once the Center reviews Khalid's placement, as it must, the Center's fresh decision becomes the current source of both Khalid's No Fly List placement and his terrorist watchlist placement. Now that Khalid knows he is on both the watchlist

and the No Fly list and that TSA sees no ground to afford him relief through DHS TRIP, he has no practical need to reengage that process. With no new TSA Final Order regarding his current No Fly listing and no obligation to seek one, Khalid may go to district court and bring a single suit against the Center challenging both renewed placements consistently with the majority's view of the exclusive power of our court. Indeed, he may do so immediately. The premise operative in this case—that the TSA Administrator's June 2022 Final Order dictates Khalid's presence on the No Fly List—has in fact long been superseded. Khalid's current listings are governed by the most recent decision of the Center. Even under today's majority decision, a district court has jurisdiction to review Khalid's renewed challenges to placement on both lists unless and until Khalid once again pursues DHS TRIP.